10 CV 139

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERICA P. JOHN FUND, INC., on Behalf of Itself and all Others Similarly Situated,

Plaintiff,

v.

NOVARTIS AG, NESTLE S.A., DANIEL VASELLA, CARY R. RAYMENT, KEVIN BUEHLER, WERNER J. BAUER, PAUL BULCKE, FRANCISCO CASTAÑER, JAMES SINGH, and HERMANN WIRZ,

Defendants.

---

Civil Action No. **10 CV 139**

**ECF CASE**

**SHAREHOLDER CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

RECEIVED
JAN – 7 2010
U.S.D.C. S.D. N.Y.
CASHIERS

---

Plaintiff Erica P. John Fund, Inc., formerly known as the Archdioceses of Milwaukee Supporting Fund, ("Plaintiff" or the "Fund"), by its undersigned attorneys, submits this Shareholder Class Action Complaint ("Complaint") on behalf of itself and a class of all other similarly-situated shareholders of Alcon, Inc. ("Alcon" or the "Company") against Novartis AG ("Novartis"), Nestlé S.A. ("Nestlé") and certain directors of the Company, and certain third parties. Plaintiff bases its allegations on actual knowledge as to its own acts and on information and belief as to all other allegations after due investigation by counsel.

## SUMMARY OF THE ACTION

1.     This action is brought by an institutional shareholder of Alcon, on behalf of itself and the holders of the 23% of Alcon shares that are publicly traded (together, "the Class") – all of which trade on the New York Stock Exchange ("NYSE") – and which are set to be extinguished for a grossly inadequate price by Alcon's controlling shareholders. In short, despite trading on the NYSE (which provides various protections to minority shareholders), despite extensive protections provided to minority shareholders in Alcon's organizational documents,

and despite protections afforded to investors under the Swiss Code of Federal Obligations, (where Alcon is incorporated), Alcon's controlling shareholders – Novartis and Nestlé – are attempting to force on the minority shareholders a transaction providing them with no vote and no ability to refuse. The controllers are openly touting that no law protects the minority and no law restricts the controllers' ability to force a deal on any terms upon the minority. In effect, Nestle and Novartis are treating this as a lawless transaction. This Court, in this Action, is the core impediment to allowing the controllers to have their way.

2.      Since 2008, Novartis has sought to acquire Alcon, which has been majority-owned by Nestlé. Novartis currently owns roughly 25 percent of Alcon's outstanding stock pursuant to an April 2008 purchase from Nestlé (the "First Stage Acquisition"). At the same time, Novartis secured an option to buy Nestlé's remaining 52 percent Alcon stake, beginning January 1, 2010 (the "Second Stage Acquisition") (together, the "Nestle Deal"). As explained below, this call option, coupled with a stockholder agreement between Nestlé and Novartis, has effectively made Novartis Alcon's controlling shareholder, via its effective control of Nestle's equity stake. Nestlé transferred control of Alcon to Novartis by pledging support for Novartis Board candidates; allowing Novartis candidates to replace Nestle representatives on the Alcon Board; and pledging to vote in favor of Novartis' initiatives at Alcon.

3.      On January 4, 2010, Novartis announced that it had exercised its option to purchase the remainder of Nestlé's Alcon stock. The consideration to be paid by Novartis to Nestlé amounted to approximately $180 per share in cash, representing a total purchase price of roughly $28.1 billion for the 52 percent of the Company. At the same time, Novartis announced that it intends to squeeze out the remaining 23 percent interest in Alcon held by public minority

shareholders for non-cash consideration consisting of 2.8 shares of Novartis stock, which, as of January 6, 2010, amounted to only approximately $147 per share of Alcon (the "Public Offer").

4.    In light of the $180 price that Novartis will pay Nestlé for its shares in Alcon, the Public Offer is patently inadequate. Alcon's public shareholders, moreover, are unable to protect their own interests or rebuff the offer because of Novartis and Nestlé's control over the Company. Novartis and Nestle also carefully structured the Public Offer to deprive Alcon's minority shareholders of any protection or legal redress, and Novartis has stated as much.

5.    Novartis has suggested that Alcon's public shareholders have no remedy at law - stating that the Public Offer is not subject to NYSE tender offer rules despite Alcon's NYSE listing. Novartis further stated that Swiss law does protect minority shareholders either. Alcon's independent directors have publicly called Novartis' actions coercive and in violation of applicable restrictions in Alcon's corporate foundational documents. However, because Novartis made clear its intent and will to remove the independent directors if they dare oppose Novartis' predatory conduct, the independent directors cannot – absent judicial intervention – act to protect Alcon's minority shareholders from consummation of the Nestle Deal and the Public Offer, at terms wholly unfair the Class. As Bernstein research analyst Tim Anderson noted, "It appears that Novartis can force through the rest of the transaction, leaving minority shareholders in Alcon without much power. This comes as a surprise and is different from how minority-interest transactions are handled in the U.S."

6.    Novartis can either use its control over the Alcon Board to effectuate a discounted buyout of Alcon's minority shareholders (as it is attempting to do now), or it can wait until it consummates the purchase of Nestlé's remaining stake in the Company and then use its majority position to push through the deal. Novartis can push through the $39 billion deal once it takes

majority control of Alcon from Nestlé because according to Novartis, under Swiss law, mergers require approval of two-thirds of shareholders and a simple board majority which Novartis has already secured.

7.     This "force-through" would violate Alcon's own Board of Directors Organizational Regulations (the "Organizational Regulations") because the Company's regulations require a change-in-control transaction such as the one at issue to be blessed by the independent directors on Alcon's Board.  Novartis' circumvention of the independent director review process is a clear violation of Alcon's Organizational Regulations.  The force-through also violates the Swiss Code of Federal Obligations, which provides that transactions like this one must be approved by a majority of the board of directors with interested directors abstaining from the vote.

8.     If consummated, the squeeze-out of Alcon's minority shareholders will severely and irreparably injure the Class.  Alcon's public shareholders hold approximately 69 million shares of Alcon stock, standing to lose roughly $33 per share, or $2.3 billion as a result of Defendants' disparate, unfair, and illegal treatment.  It is to prevent such grave and irreparable harm that Plaintiff, on behalf of the Class, now brings the claims set forth herein in law and equity.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

10.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in this District or is an individual who either is

present in New York for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) Defendants are aliens who may be sued in any District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiff

12.    Plaintiff Fund is a charitable foundation organized and existing under the laws of the State of Wisconsin.  Plaintiff's principal place of business is in Milwaukee, Wisconsin. Plaintiff is a current shareholder of Alcon.

### Defendants

13.    Defendant Novartis is a multinational pharmaceutical company based in Basel, Switzerland.  Novartis had over $53 billion in revenues in 2008, and roughly $36.2 billion in 2008 sales.  Novartis is one of the largest healthcare companies in the world and a leading giant among pharmaceutical companies.  Novartis was created in 1996 from the merger of Ciba-Geigy and Sandoz Laboratories.

14.    Defendant Nestlé is a multinational packaged foods company founded and headquartered in Vevey, Switzerland, and listed on the SWX Swiss Exchange with a market capitalization of over 87 billion Swiss francs.  Nestlé originated in 1905 and currently manufactures and sells a wide range of products around the world in a number of markets.

15.    Daniel Vasella ("Vasella") has served as a director of Alcon since July 2008 following Novartis' First Stage Acquisition of Nestlé's Alcon shares. He is the Chief Executive Officer of Novartis and the nominee of Novartis to the Alcon Board of Directors. Vasella, with Raymond Breu, engineered the Proposed Merger on behalf of Novartis. Vasella is a citizen of Switzerland.

16.    Cary R. Rayment ("Rayment") is the former Chairman, President, and Chief Executive Officer of Alcon, retiring in March 2009. Since that time, he has been the non-executive Chairman of Alcon's Board of Directors. He is a resident of Texas.

17.    Kevin Buehler ("Buehler") has served as President and Chief Executive Officer of Alcon since April 2009, and a member of the Board of Directors. Buehler began his career with Alcon in 1984 and has since served in various capacities at Alcon. He is a resident of Texas.

18.    Werner J. Bauer ("Bauer") has served as a director of Alcon since March 2002. He is one of five nominees of Nestlé to the Alcon Board of Directors. Bauer has served as Executive Vice President, Technical, Production, Environment and R&D of Nestlé since May 2002 and in February 2007, was appointed Chief Technology Officer, Head of Innovation, Technology R&D for Nestlé. Bauer began his career with Nestlé in 1990 as Head of Nestlé Research Center in Lausanne, Switzerland and has since served in various capacities at Nestlé. He is a citizen of Switzerland.

19.    Paul Bulcke ("Bulcke") has served as a director of Alcon since May 2008. He is one of five nominees of Nestlé to the Alcon Board of Directors. Bulcke has served as a director of Nestlé and as Nestlé's Chief Executive Officer since April 10, 2008. Bulcke began his career with Nestlé in 1979 and has since served in various capacities at Nestlé. He is a citizen of Belgium.

20.     Francisco Castañer ("Castañer") is Vice Chairman of the Alcon Board of Directors and has served as a director of Alcon since July 2001.  He is one of five nominees of Nestlé to the Alcon Board of Directors.    Castañer has served as Nestlé's Executive Vice President, Pharmaceutical and Cosmetic Products, Liaison with L'Oréal S.A., Human Resources and Corporate Affairs since 1997.  Castañer began his career with Nestlé in 1964 and has since served in various capacities at Nestlé.  He is a citizen of Spain.

21.     James Singh ("Singh") has served as a director of Alcon following Novartis' First Stage Acquisition of Nestlé's Alcon shares.  He is one of five nominees of Nestlé to the Alcon Board of Directors.  Singh has served as Nestlé's Executive Vice President and Chief Financial Officer since 2008.  Singh began his career at Nestlé in 1977 and has since served in various capacities at Nestlé.  He is a citizen of Canada.

22.     Hermann Wirz ("Wirz") has served as a director of Alcon since May 2009.  He is one of five nominees of Nestlé to the Alcon Board of Directors.  Wirz serves as Nestlé's Chief Accounting Officer.  Wirz began his career with Nestlé in 1972 and has since served in various capacities at Nestlé.  He is a citizen of Switzerland.

23.     Defendants Vasella, Rayment, Buehler, Bauer, Bulcke, Castañer, Singh, and Wirz are referred to herein as the "Director Defendants."

**Pertinent Non-Defendants**

24.     Alcon is a corporation organized and existing under the laws of Switzerland. The Company's registered place of business is in Hünenberg, Switzerland.  Alcon's principal United States offices are located at 6201 South Freeway, Fort Worth, Texas 76134-2099, U.S.A.  According to the Company's public filings, Alcon is a world leader in high quality ophthalmology products.  In 2008, Alcon had over $6.29 billion in sales.  Alcon trades publicly on the NYSE under the symbol ACL.

25.     Thomas G. Plaskett ("Plaskett") has served as a director of Alcon since May 2003 and is not affiliated with either Novartis or Nestlé nor an officer or employee of Alcon. He is a member of the Independent Committee of Alcon's Board of Directors.

26.     Lodewijk J.R. de Vink ("de Vink") has served as a director of Alcon since March 2002 and is not affiliated with either Novartis or Nestlé nor an officer or employee of Alcon. He is a member of the Independent Committee of Alcon's Board of Directors.

27.     Joan W. Miller ("Miller") has served as a director of Alcon since May 2009 and is not affiliated with either Novartis or Nestlé nor an officer or employee of Alcon. She is a member of the Independent Committee of Alcon's Board of Directors.

28.     Messrs. Plaskett and de Vink and Ms. Miller are sometimes referred to collectively herein as the "Independent Directors" or the "Independent Committee."

## SUBSTANTIVE ALLEGATIONS

**A.     Background on Alcon, Nestlé and Novartis**

29.     Nestlé acquired Alcon in 1978 and retained 100 percent ownership until March 2002, when the company conducted an initial public offering (IPO) of about 25 percent of Alcon's shares, with Nestlé retaining ownership of the balance. Alcon shares started trading on the NYSE under ticker symbol ACL on March 21, 2002. Nestlé remains Alcon's primary shareholder, with 52 percent of Alcon's issued capital.

30.     Nestlé and Novartis entered into an agreement in April 2008 (the "Purchase and Option Agreement") for Novartis to buy approximately 74 million shares of Alcon stock owned by Nestlé. With the completion of the First Stage Acquisition in July 2008, Nestlé remains Alcon's majority shareholder, holding about 52 percent of Alcon. Novartis owns a minority interest of 24.85 percent of Alcon, but through its relationship with Nestle shares effective control of the Company. The two companies also announced a second stage of the agreement

which could allow Novartis to purchase the remaining Nestlé shares and become the majority owner of Alcon, with a stake of approximately 77 percent. The second stage could not begin until January 1, 2010 and could extend through July 31, 2011. There are no requirements in the agreement for Novartis to acquire the publicly traded shares of Alcon.

### B.    The Purchase and Option Agreement

31.    On April 6, 2008, Novartis and Nestlé entered into the Purchase and Option Agreement under which Novartis obtained the right to acquire Nestlé's majority stake in Alcon in two steps. Subject to, and in accordance with, the terms and conditions of the Purchase and Option Agreement, Nestlé agreed to sell to Novartis, and Novartis agreed to purchase from Nestlé, the "First Stage Shares" for the "First Stage Closing Amount" which reflected an aggregate purchase price equal to $10.6 billion, minus an amount equal to any dividends paid or declared by Alcon with respect to the First Stage Shares between the date the agreement was signed and completion of the First Stage Acquisition.

32.    After consummation of the First Stage Acquisition in July 2008, Novartis became a minority shareholder with approximately 24.8% of Alcon's outstanding Shares, while Nestlé remained Alcon's majority shareholder, with roughly 156,076,263 Shares, or approximately 52.2% of the Alcon's outstanding Shares

33.    The Purchase and Option Agreement between Nestlé and Novartis also contained put and call option rights on the remaining Alcon shares owned by Nestlé. The rights would vest on January 1, 2010 and expire on July 31, 2011. As outlined by the two parties, these rights granted (i) Novartis a call option to buy Nestlé's remaining Alcon shares at a fixed price of $180 per share and (ii) Nestlé a put option to sell its remaining Alcon shares to Novartis at the lower of Novartis's call price of $180 per share or at a 20.5 percent premium above the market price of Alcon shares, which would be calculated as the average price of Alcon shares during the week

preceding the exercise date of the put option. As an economic matter, once Alcon shares traded in the market at a price within 20.5% of $180 per share, Nestle becomes economically disinterested, since Novartis can purchase the shares at $180 per share (so that Nestle cannot enjy any further upside benefits) and Nestle can sell the shares at that price without bearing any downside risk in Alcon.

34.    On April 6, 2008, Nestlé and Novartis also executed a Shareholders Agreement (the "Shareholders Agreement") that gives Novartis effective control over Alcon. The Shareholders Agreement provides for the expansion of the Alcon Board of Directors from eight to ten members upon the completion of the sale, with one of the additional members designated by Nestlé and one designated by Novartis. The Shareholders Agreement created arrangements to keep control of Alcon strictly to Novartis and Nestlé. Specifically, these parties caused Alcon's Board of Directors to comprise ten seats (which were subsequently increased to 11). Of these ten seats, one was to be held by a nominee of Novartis, and five were to be held by nominees of Nestlé. In addition, one seat was to be held by the Chief Executive Officer of Alcon. Finally, three seats were to be held by "individuals nominated by the Nominating/Corporate Governance Committee that qualify as independent directors and who are not Novartis or Nestlé designees."

35.    Alcon's shareholders voted to expand the Alcon board and elected two new directors at Alcon's annual general meeting held on May 6, 2008 in Zug, Switzerland. James Singh, Nestlé's executive vice president and chief financial officer and Nestlé's designee, and Daniel Vasella, M.D., chairman and chief executive officer of Novartis and Novartis's designee, were elected to these two director positions and joined Alcon's board upon the closing of the First Stage Acquisition on July 7, 2008.

36.    The Shareholders Agreement also contains certain provisions relating to the corporate governance of Alcon, the relationship between Novartis and Nestlé as shareholders of Alcon, and certain existing arrangements between Nestlé and the Alcon.  In particular,

> "the Shareholders Agreement requires Nestlé and Novartis to vote their Shares to elect two additional individuals, one designated by Novartis (the "Novartis Designee") and one designated by Nestlé, to the Board as described above, and to use their reasonable *best efforts to cause the Board to call and hold an extraordinary general meeting of the shareholders of [Alcon] prior to the completion of the Second Stage Acquisition and to vote their Shares to elect five individuals designated by Novartis as directors of [Alcon]. Nestlé separately agreed to use its reasonable best efforts to cause the five directors on the Board designated by Nestlé (the "Nestlé Designees") to resign at that time.* (emphasis added)

37.    In addition, the Shareholders Agreement provides:

> "to the extent consistent with applicable laws, that *the Nestlé Designees shall consult with any directors designated by Novartis prior to any Board meetings and prior to any Board action being taken.  Nestlé further agreed, if requested by Novartis, to use its reasonable best efforts to cause the Nestlé Designees to either vote against certain significant actions or to submit such significant actions to a vote of the shareholders* of [Alcon] (so long as, in either case, such action would not violate the Nestlé Designees' fiduciary duties to the Issuer under Swiss corporate law)." (emphasis added)

38.    The Shareholders Agreement not only provides for the eventual replacement of Nestlé's designees with those selected by Novartis, but also requires Nestlé's designees to act on Novartis' behalf during the remainder of their service on the Alcon Board.  Nestlé is in breach of the fiduciary duties it owes the Company and its minority shareholders by adhering to the Shareholders Agreement and causing the Nestlé Designees to act on behalf of Novartis instead of the Company.

39.    On or about January 1, 2010, Novartis exercised its option to complete the Second Stage Acquisition of the Purchase and Option Agreement.  On January 4, 2010, Novartis and Nestlé initiated completion of the Purchase and Option Agreement, whereby Novartis is exercising its call option to acquire Nestlé's remaining 52 percent Alcon stake for $28.1 billion,

or $180 per share. This acquisition, which is subject to required regulatory approvals, is expected to be completed in the second half of 2010 and will raise Novartis' ownership of Alcon to approximately 77 percent of the Company's outstanding equity.

### C.    The Public Offer

40.    On January 4, 2010, Novartis also announced its intention to purchase the remaining 23 percent stake in the Company held by public shareholders.

41.    On January 3, 2010, Novartis sent a letter to Cary Rayment, Chairman of the Alcon Board of Directors, offering to purchase all of the publicly-held Alcon stock. The letter proposed "a fixed exchange ratio of 2.80 Novartis shares for each outstanding Alcon share." Under the terms of the Public Offer, Alcon's shareholders would have the choice of receiving Novartis American Depositary Shares ("ADSs") as merger consideration.

42.    Based on the Novartis closing share price of CHF 56.50 on December 30, 2009 (the last trading day before the offer letter), the Public Offer valued each public share of Alcon at $153 on the day it was announced.  This represents a 7% discount to Alcon's closing stock price of $164.35 on December 31, 2009, the last trading day prior to Novartis announcement, and is a material discount to the $180 per share that Novartis will be paying Nestlé at the same time. Further, the offer to Alcon's public shareholders does not have the certainty of value that Nestlé is receiving for its stake as demonstrated herein.

43.    Because the Public Offer contains a fixed exchange ratio – that is, no downside protection for a drop in Novartis stock price - the offer to Alcon's public shareholders is volatile and has already lost significant value.  The price for minority holders was initially indicated at $153 per share, but the value of Novartis shares has since declined. *As of January 6, 2010, Novartis stock had fallen to $52.37 per share corresponding to consideration of only approximately $147 for each share of Alcon*—representing a $33 (or 18.3 percent) discount to

the consideration Novartis paid to Nestlé for its 52% stake in Alcon to be forced on Alcon minority shareholders.

44.    ***Novartis can push through the $39 billion deal*** once it takes majority control of Alcon from Nestlé because, under Swiss law, mergers require approval of two-thirds of shareholders and a simple board majority. As a result, Alcon's public shareholders will never get an opportunity to vote or otherwise determine whether to part with their property for the price offered.

45.    "Novartis appears to be attempting to circumvent the minority protection principle ... by claiming that the Alcon minority shareholders are neither accorded minority protections under the Swiss Takeover Code nor the rules under the NYSE," the Alcon directors committee said in a statement.

**D.    Minority Shareholders Have No Protection According to Novartis**

46.    Novartis is currently a controlling shareholder of Alcon through its control of the Alcon Board, and upon completion of the Second Stage Acquisition, will also be Alcon's majority shareholder. Under Swiss Merger law, a simple majority of Alcon's Board and a super-majority of shareholders only need to approve the Public Offer for it to be consummated. Novartis has also purposefully structured the Public Offer to escape the rules of the NYSE.

**E.    Duties of Novartis, Nestlé and the Alcon Board**

47.    The Novartis and Nestlé defendants, as well as the officers and directors of Alcon owe fiduciary duties to Alcon's public shareholders. Rather than abide by these duties in good faith, the Defendants herein have sought to use their control of the Company to unjustly enrich themselves at the expense of Alcon's minority shareholders.

**F.    The Public Offer Violates the Company Organizational Regulations**

48.    According to a press release published by Alcon on January 4, 2010, the

Independent Committee was specifically formed after Novartis and Nestlé entered into the Purchase Option Agreement and Novartis acquired a 25 percent interest in the Company pursuant to the First Stage Acquisition for the very purpose of protecting shareholders from the abusive situation which they now face. This release stated, in part, the following:

> *Following Novartis' initial purchase from Nestlé of an approximately 25 percent stake in Alcon, the Alcon Board of Directors recognized the need for the establishment of a standing committee of independent directors whose stated purpose is to protect the minority shareholders* in connection with a number of transactions, including related party transactions between Alcon and major shareholders of Alcon. This action was approved by the full Alcon Board of Directors in December 2008.

(Emphases added.)

49.     And in a second release dated the same day, Alcon reiterated this point by stating that:

> *The Alcon Board of Directors established an Independent Director Committee of the Alcon Board of Directors in 2008 in connection with Novartis' initial purchase of approximately 25 percent of the Alcon shares from Nestlé in order to protect the interests of the minority holders of publicly-held Alcon shares in transactions such as Novartis' merger proposal…*

(Emphases added.)

50.     The current Independent Directors of Alcon, Messrs. Plaskett and de Vink and Ms. Miller, have each indicated that they will not necessarily vote to approve the Public Offer. Thus, as of today's date, the Public Offer lacks the approval of *any*—much less a majority of—the Independent Directors.

51.     Notwithstanding the lack of independent director support, Defendants have stated publicly that they intend to go forward with the Public Offer without regard to the positions of the Independent Directors and whether or not the Independent Directors will approve it. Defendant Vasella, Novartis's CEO, has asserted that, once Novartis possesses Nestlé's former stake, it can proceed with the transaction without the approval of Alcon's Independent Directors.

52.     In a press release published by Novartis on January 4, 2010, Novartis specifically stated that the merger would require only a vote by the full boards of Novartis and Alcon and purposefully failed to mention the requirements under Swiss takeover law and Alcon's Organized Regulations that require approval by the independent directors.  As further evidence of this, the Novartis release states, in part, that:

> The merger will be conditional on the closing of the 52% stake acquisition from Nestlé and would require approval by the Boards of Directors of Novartis and Alcon.  The merger would also require two-thirds approval by the shareholders of Novartis and Alcon voting at their respective meetings . . . .  Under Swiss law, Novartis has the right to vote its Alcon stake in favor of the proposed merger.

53.     Accordingly, in violation of Alcon's own Organizational Regulations, Novartis has taken the position that the Public Offer requires only the approval of *simple majorities* of the Novartis and Alcon Boards of Directors, together with two-thirds majorities of each company's shareholders.  Since Novartis will hold approximately 77 percent of Alcon's shares once it completes the Nestlé acquisition, Novartis's position would mean that the public shareholders of Alcon have no say in the Public Offer whatsoever—rendering the two-thirds shareholder vote requirement a sham with respect to Alcon.  Indeed, if Novartis's position were accepted, it would mean that Novartis could simply vote its approximately 77 percent block of shares in favor of the Public Offer and then bless the deal using its 8 (out of 11) captive directors.  This is an unconscionable result and one that is prohibited by Alcon's Organizational Regulations.

54.     Alcon's Organizational Regulations require that a change in control of the Company be approved by a majority of the Independent Directors.  In fact, Article V Section 5 of the Company's Organizational Regulations were specifically drafted to protect the rights of Alcon's minority shareholders against the possible encroachments of its majority shareholder, stating as follows:

**Section 5.  Independent Director Committee.**

If any of the following transactions is proposed to be taken by the Company, the Board shall form a special committee of no less than three independent directors as defined under the NYSE Rules who shall be responsible for protecting the interests of the minority shareholders of the Company.  *The Board shall only resolve such matters if a majority of the members of Independent Director Committee so recommends.*  Such matters are:

> (a) *a proposed merger, takeover, business combination or related party transaction of the Company with the Majority Shareholder or any group company of the Majority Shareholder;*
>
> (b) a proposed bid for the shares of the Company by any entity owning a majority of the Company's outstanding voting rights;
>
> (c) a proposed repurchase by the Company of all the shares not owned by an entity
> owning a majority of the outstanding voting rights of the Company; or
>
> (d) any change to the powers and duties of the Independent Director Committee.

(Emphases added.)

55.    This language is also followed by Article VIII, Sections 1, 2 and 3 of the Organizational Regulations, which furnish rules for situations—like here--where there is a conflict of interest among Alcon Board members.  These sections state, in part, the following:

**Conflict of Interest**

**Section 1.  Definitions.**

For purposes of Articles VIII and IX:

(a) **Conflicting Interest** shall mean any interest a Board member may have with respect to a matter due to the fact such Board member or a Related Person (as hereinafter defined) has a financial or non-financial interest (including but not limited to an interest with respect to such matter for a Related Person that is detrimental to the Company or at conflict with the interests of the Company (**Competitive Interest**)) in, or is otherwise closely linked to, the matter, and such interest is of such significance to the Board member or a Related Person that the interest would reasonably be expected to interfere with the Board member's

judgement if he were called upon to participate in discussions of the Board or any Board Committee relating to, or vote on, the matter.

*    *    *    *

**Section 2.  General.**

A Board member who believes that he may have a Conflicting Interest (**Conflicting Director**) which involves the Company shall inform the Chairman of the fact and the nature of the Conflicting Interest as soon as he becomes aware of such Conflicting Interest. In the event that the Chairman becomes aware of a Board member's potential Conflicting Interest, the Chairman shall promptly contact the potentially Conflicting Director and discuss with the Conflicting Director the nature and extent of such Conflicting Interest.

Upon receipt of the notice that a Board member has a Conflicting Interest, or upon the Chairman becoming aware of a Conflicting Interest of a Board member, the Chairman will implement the appropriate measures to ensure that the interests of the Company are adequately protected. The Chairman will resolve to what extent the Conflicting Director shall be excluded from information and deliberations relating to the matter giving rise to the Conflicting Interest. At the next meeting of the Board, the Chairman shall inform the Board about the Conflicting Interest and the measures taken in order to adequately protect the Company. To the extent that a Board member disagrees with the conclusion that a Conflicting Interest exists or with the measures taken to address such Conflicting Interest, he may request that the Board consisting of non-Conflicted Directors only shall resolve as to the issue of the existence of a Conflicting Interest and the measures to be taken.

In the event that the Chairman is the Conflicting Director, the Chairman or any Board member who becomes aware of the Conflicting Interest shall inform the Board about the Conflicting Interest and, following a discussion with the Chairman, the members of the Board other than the Chairman shall determine the appropriate measures to take to protect the Company's interests and determine to what extent the Chairman shall be excluded from pertinent information, the deliberations and the voting relating to the matter giving rise to the Conflicting Interest.

Subject to any applicable statutory provisions to the contrary, a Board member shall not be disqualified by his office from entering into any contract with the Company (either with regard to his tenure of any office or position with the Company, or as vendor, purchaser or otherwise).

**Section 3.  Duty to Abstain.**

Members of the Board shall abstain from exercising their voting rights in matters involving a Conflicting Interest; it being understood that they shall abstain from participating in, or receiving any information in respect of, any item or matter brought before the Board or any Board Committee in which they may have a Competitive Interest. If a Board member is required to abstain from voting in a matter, he shall not be counted in the quorum of the meeting in question. In addition, such Board member, as well as the other members of the Board, shall use their respective best efforts to ensure that the Board member with the Conflicting Interest does not receive any non-public, proprietary and/or confidential information with respect to such matter. In particular, and without limitation to the foregoing, a Board member shall not vote or be counted in the quorum of the meeting in respect of any resolution concerning the following matters:

(a) his own appointment, including fixing and varying its terms;

(b) the termination of his own appointment as the holder of any office with the Company or an y other company in which the Company holds an equity interest;

(c) any transaction in which he or any Related Person is an interested party.

Notwithstanding the provisions of the foregoing paragraph, a director shall be entitled to vote and be counted in the quorum on:

(a) any issue or offer of securities of the Company in respect of which the director or any Related Party is or may be entitled to participate in their capacity as holder of any such securities;

(b) any contract in which he or any Related Party is interested only by virtue of his interest in securities of the Company;

(c) any contract concerning pension fund or retirement, death or disability benefits
schemes under which he may benefit and which affords to directors only those privileges and advantages which are generally afforded to the employees to whom the fund or scheme relates;

(d) on any proposal regarding the stock incentive plan which relates both to directors and employees and affords to any directors only those privileges and advantages which are generally afforded to the employees to which the scheme relates; and

(e) any contract concerning the purchase or maintenance of insurance for any director or officer of the Company against any liability.

56.    As a result of the foregoing, Defendants' consummating the Public Offer regardless of the Independent Directors' approval thus will constitute a violation of Alcon's Organizational Regulations.

57.    The Independent Directors of Alcon have stated their firm opposition to the Public Offer as proposed by Novartis.  A press release dated January 4, 2010 stated in pertinent part:

**Alcon Independent Director Committee Responds to Novartis**

HUENENBERG, Switzerland, Jan 04, 2010 (BUSINESS WIRE) -- The Alcon, Inc. (NYSE: ACL) Independent Director Committee, in response to comments made today by Novartis AG (NYSE: NVS), stated its belief that Alcon has established certain important protections for the benefit of Alcon's minority shareholders against a coercive takeover bid and is disappointed that Novartis is attempting to circumvent those protections and corporate governance best practices.

Alcon, a majority-controlled entity since it became a public company in 2002, established certain protections in its governing documents for the benefit of its minority shareholders. *For example, Article V, Section 5 of Alcon's Organizational Regulations requires approval by a committee of independent directors (as defined under the New York Stock Exchange rules) in connection with a number of transactions, including any proposed merger with a majority shareholder.* The full Organizational Regulations are available on Alcon's website at www.alcon.com/en/investors-media/ (click through Corporate Governance).

\*    \*    \*

*Novartis appears to be attempting to circumvent the minority protection principles embodied in the actions noted above by claiming that the Alcon minority shareholders are neither accorded minority protections under the Swiss Takeover Code nor the rules under the NYSE.*

*Under any circumstance, Swiss corporate law requires any merger proposal to be approved by a majority of the Alcon Board of Directors with "interested" directors abstaining.* Assuming that the Novartis and Nestlé board representatives along with the Alcon executive board representative abstain, approval by the independent directors comprising the Independent Director Committee would be required to approve a merger with Novartis.

> *On its investor conference call this morning, Novartis expressed its view that, if it were unable to obtain the required approval of the Alcon Board of Directors and the Independent Director Committee, Novartis would simply wait until it owned 77 percent of Alcon to then unilaterally impose the terms of the proposed merger on the minority shareholders. Such a unilateral action would clearly be inconsistent with the minority protection principles upon which Alcon established itself and Alcon shareholders rely.*

> While Novartis has expressed its view that the merger proposal is fair, the Independent Director Committee and its advisors will inform the Alcon shareholders of its formal position once the Committee and its advisors complete their evaluation.

(Emphases added.)

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings these claims as class claims, pursuant to Federal Rule of Civil Procedure 23, on behalf of itself and all other persons who owned shares of Alcon common stock as of the date hereof and who will have their Alcon shares acquired by Novartis in the squeeze-out at 2.8 shares of Novartis per share of Alcon (or another price which is different than the price paid to Nestlé for Nestlé's 52 percent block of shares in the transaction announced on January 4, 2010), and were damaged thereby.  Excluded from the Class are Novartis, Nestlé, the Director Defendants, affiliates of the Defendants, and the immediate family members of the Director Defendants.

59.    These claims are properly maintainable as class claims for the following reasons:

(a)    The Class is so numerous that joinder of all members is impracticable. For the year ended December 31, 2008, Alcon had outstanding 298,648,353 shares of its common stock, held by individuals and institutions too numerous to bring separate actions.  Moreover, it is reasonable to assume that holders of Alcon common stock are geographically dispersed throughout the United States and the world.

(b)    Plaintiff will fairly and adequately protect the interests of the members of the Class, inasmuch as it is a member of the Class and its claims are typical of the claims of all Class members.    Plaintiff has retained competent counsel experienced in class action litigation.    Plaintiff's interests are to obtain appropriate relief for itself and for the Class for the harms arising out of the misconduct set forth herein.

(c)    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.    The common questions include:

(i)    Whether the conduct of Defendants in consummating the Public Offer will constitute a violation of their fiduciary duties owed to their shareholders;

(ii)    Whether the conduct of Defendants in consummating the Public Offer will constitute a violation of the Swiss Code of Federal Obligations;

(iii)    Whether the conduct of Defendants in consummating the Public Offer will constitute a violation of Alcon's Organizational Regulations; and

(iv)    Whether Plaintiff and the Class will suffer damages as a foreseeable consequence of the Public Offer; and

(v)    Whether Plaintiff and the Class are entitled to equitable relief preliminary or permanently enjoining the Public Offer.

(d)    A class action is superior to other available methods for the fair and efficient adjudication of Plaintiff's claims.    It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action for these claims.    In addition, the bringing of separate actions would put a substantial and

unnecessary burden on this and other Courts throughout the United States, while a single class action can determine the rights of all class members with judicial economy.

(e)     Furthermore, as the damages suffered and to be suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs committed against them.  No unusual difficulties are likely to be encountered in the management of the class claims.

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of in the direct claims, thereby making appropriate the relief sought in those claims with respect to the Class as a whole.

(g)     The prosecution of separate actions would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or adjudications which as a practical matter might be dispositive of the interests of other members of the Class.

## CLAIMS FOR RELIEF

### COUNT I

**Against Novartis, Nestle, and the Director Defendants
for Violation of Fiduciary Duty**

60.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

61.     Novartis and Nestle, acting independently and in unison, are controlling shareholders of Alcon.  In particular, Nestle holds an absolute majority of Alcon's equity while Novartis exercises economic and practical control of its own significant stake as well as of Nestle's equity stake.   Accordingly, Novartis and Nestle owe fiduciary duties to Alcon's

minority shareholders.

62.    By virtue of their director positions, Director Defendants owe fiduciary duties to Alcon and its public shareholders.

63.    Novartis, Nestle and the Director Defendants are ignoring and violating the rights of Alcon's minority shareholders, who purchase their shares on the NYSE.

64.    By reason of the foregoing, these defendants have caused Plaintiff and the Class to suffer substantial harm.

65.    The Class will be irreparably harmed if these defendants are allowed to proceed with the Public Offer.

66.    Plaintiff has no adequate remedy at law.

## COUNT II

### Against Alcon and the Director Defendants
### for Violation of Alcon's Organizational Regulations

67.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

68.    The conduct of Alcon and the Director Defendants violates Alcon's Organizational Regulations, which provides that transactions such as the Public Offer must be approved by a majority of the independent directors of Alcon's Board of Directors.

69.    By reason of the foregoing, these defendants have caused Plaintiff and the Class to suffer substantial harm.

70.    The Class will be irreparably harmed if these defendants are allowed to proceed with the Public Offer.

71.    Plaintiff has no adequate remedy at law

## COUNT III

### Against Novartis and Nestle for Unjust Enrichment

72.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein

73.    Defendants Nestle and Novartis are being enriched at the expense of the Class.

74.    The enrichment is unjust as it stems from an abuse of power and breach of fiduciary duty.

75.    Plaintiff has no adequate remedy at law.

### **PRAYER FOR RELIEF**

**WHEREFORE** Plaintiff demands judgment as follows:

A.    Determining that this action is a proper class action maintainable under Federal law, and that Jurisdiction and Venue are proper in this Court and Judicial District;

B.    Awarding, against all Defendants and in favor of the Class, the value lost as a result of Defendants' breaches of fiduciary duties;

C.    Against all Defendants and in favor of Plaintiff and the Class for the amount of damages sustained by them as a result of Defendants violations of the Swiss Code of Federal Obligations and Alcon's Organizational Regulations;

D.    Declaring that the Public Offer violates the Swiss Code of Federal Obligations and Alcon's Organizational Regulations;

E.    Preliminarily and permanently enjoining the Public Offer until such time as the Independent Directors vote to approve it and the consideration to be paid to minority shareholders of Alcon is fair, reasonable, and just in the circumstances;

F.    Awarding to the Class restitution from Defendants;

G.     Directing the Alcon Board, Novartis and Nestlé to take all necessary actions to comply with their respective fiduciary duties under applicable law;

H.     Awarding Plaintiff and the Class the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 7, 2010.                Respectfully submitted,

                                        BERNSTEIN LITOWITZ BERGER &
                                        GROSSMANN LLP

                                        _____
                                        Gerald H. Silk
                                        Mark Lebovitch
                                        Amy Miller
                                        1285 Avenue of the Americas
                                        New York, New York 10019
                                        Telephone: (212) 554-1400
                                        Fax: 212-554-1444


                                        KAHN SWICK & FOTI, LLC
                                        Lewis S. Kahn
                                        *lewis.kahn@ksfcounsel.com*
                                        Neil Rothstein
                                        *neil.rothstein@ksfcounsel.com*
                                        Albert M. Myers
                                        *albert.myers@ksfcounsel.com*
                                        650 Poydras Street, Suite 2150
                                        New Orleans, LA 70130
                                        Telephone: (504) 455-1400
                                        Fax:  (504) 455-1498

                                        *Attorneys for Plaintiff*