UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ALCON SHAREHOLDER LITIGATION | Consolidated Case No. 10 CV 139 (VM)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded**<br><br>**ECF CASE** |

Plaintiffs Oklahoma Firefighters Pension & Retirement System, City of Monroe Employees' Retirement System, City of Westland Police & Fire Retirement System, Massachusetts Bricklayers and Masons Trust Funds, Boilermakers Lodge 154 Retirement Plan, and Erica P. John Fund, Inc., formerly known as the Archdiocese of Milwaukee Supporting Fund ("Plaintiffs"), by their undersigned attorneys, submit this Consolidated Class Action Complaint ("Complaint") on behalf of themselves and a class of all other similarly-situated minority shareholders of Alcon, Inc. ("Alcon" or the "Company") against Novartis AG ("Novartis"), Nestlé S.A. ("Nestlé"), Alcon and certain directors of the Company who are designees of and/or controlled by Novartis and Nestlé. Plaintiffs base their allegations on actual knowledge as to themselves and on information and belief as to all other allegations after due investigation by counsel.

## SUMMARY OF THE ACTION

1.     This action arises because the senior executives of two foreign corporations that control Alcon are trying to "squeeze-out" Alcon's public minority shareholders in a coercive merger that denyies those investors their most basic contractual, legal and equitable protections.

In 2008, Novartis bought 25% of Alcon, leaving Nestlé with 52% and Alcon's public shareholders with the remaining 23%. Nestlé had issued the 23% minority stake to the public years earlier, exclusively on the New York Stock Exchange ("NYSE") and primarily to American investors. Novartis' 25% stake, together with its option to buy the rest of Nestlé's Alcon shares and a shareholders' agreement that laid the groundwork for the squeeze-out, gave Novartis effective control of Alcon.

2.      At all relevant times, Alcon's Board of Directors Organizational Regulations (the "Organizational Regulations", annexed hereto as Exhibit A) required that the independent directors on Alcon's Board approve any merger with a majority shareholder (the "Independent Director Approval Right"). Indeed, in numerous public filings approved by Alcon's controlling shareholders, Alcon specifically told its minority shareholders that they could and should rely on the specific minority protections – including the Independent Director Approval Right – in acquiring Alcon shares despite Novartis' ability to become the majority shareholder. The Organizational Regulations created enforceable contract rights for Alcon's public shareholders while Alcon's public promises created enforceable equitable, or quasi-contract, rights for Alcon's public shareholders. Investors relied on these contractual and equitable obligations and would never have rationally purchased Alcon shares on the NYSE if they had been told these commitments could disappear at the whim of Novartis Chief Executive Officer and Alcon director, Daniel Vasella ("Vasella").

3.      On January 4, 2010, Novartis announced that it would pay $180 cash per Alcon share to Nestlé for its shares, representing an aggregate purchase price of roughly $28.1 billion. Novartis said it would only pay Novartis stock equal to what is currently about $150 per Alcon share to the public minority shareholders, who acquired their Alcon stakes on the NYSE and

relied upon the enforceability of Alcon's contracts and public promises (the "Challenged Transaction").

4.      Market analysts and investors promptly questioned Novartis' ability to cram the Challenged Transaction down the public investors' throats, citing among other things the Independent Director Approval Right.  While many corporate executives would seek to justify or defend actions that strip public shareholders of their rights, Vasella has shown no compunction about abusing investors and reneging on binding obligations.  Vasella, in fact, is practically bragging about how he and his American corporate lawyers contrived a scheme that, they say, denies Alcon's minority shareholders any enforceable rights or protections.  Indeed, Vasella made clear to market analysts that once Novartis completes its acquisition of Nestlé's 52% stake, Novartis intends to close the Challenged Transaction on its own self-selected terms, irrespective of the complaints by or unfairness to the minority shareholders.  On a public conference call, Vasella pronounced: "I think it's very important to understand that once [Novartis votes its 77% stake in favor of the Challenged Transaction] that then the shareholders, *the minority shareholders have no options left.  They will receive Novartis shares for their Alcon shares*."

5.      As Vasella further explained, Novartis asserts that it can either (i) use its control over the Alcon Board to effectuate a discounted buyout of Alcon's minority shareholders (as it is attempting to do now), or (ii) wait until it consummates the purchase of Nestlé's remaining stake in the Company and then use its majority position to push through the deal.  According to Vasella, Novartis can push through the $39 billion deal once it takes majority control of Alcon from Nestlé because mergers, under Swiss law, only require approval of two-thirds of the Company's shares and a simple board majority, both of which Novartis has already secured.

6.     Investors have rightly been appalled by the possibility that foreign corporations can issue shares exclusively on American stock exchanges, promising United States ("U.S.") style corporate governance protections, and then foist on the public investors a patently coercive and inequitable transaction while denying the very protections that induced public investment in the corporation in the first place.

7.     Indeed, Novartis' effort to thwart the minority protections that have been guaranteed to Alcon minority shareholders for years has sparked outcry, including form Alcon's own independent directors.  Specifically, in a letter issued publicly the day of Novartis' offer, the independent directors wrote, "Novartis appears to be attempting to circumvent the minority protection principle . . . by claiming that the Alcon minority shareholders are neither accorded minority protections under the Swiss Takeover Code nor the rules under the NYSE."  Moreover, on January 20, 2010, the independent committee rejected the Challenged Transaction and made clear their own disgust with Vasella's tactics.  In a letter to Vasella, independent committee chairman Thomas G. Plaskett described the terms of the Challenged Transaction as "grossly inadequate" and based on "fundamentally flawed" financial analysis.  Plaskett added later that Novartis demonstrated "***a profound disrespect for Alcon's minority shareholders."***

8.     While the independent directors have clearly objected to Novartis' actions as coercive and a blatant violation of Alcon's Organizational Regulations, the independent directors are not in position to stop Vasella from ignoring the rights provided to Alcon's minority shareholders.  Vasella, who plainly does not run a democracy, plans to simply remove them.

9.     Since Novartis asserts it will close the Challenged Transaction despite the outcry of the independent committee, market analysts, media and investors – and Vasella's public statements to date show that Novartis has utter disregard for the reputational harm that will result

from trampling on shareholder rights – the only avenue for relief for Alcon shareholders is this litigation.

10.    If consummated, the squeeze-out of Alcon's minority shareholders will severely and irreparably injure the Class.  Alcon's minority shareholders, the vast majority of whom are based in the U.S., hold approximately 69 million shares of Alcon stock and stand to lose roughly $30.5 per share, or over $2 billion as a result of Defendants' disparate, unfair, and illegal conduct.   Accordingly, six institutional investors seek relief, in the form of a declaratory judgment as to the contractual and quasi-contractual rights of Alcon minority shareholders (the "Class"), an injunction against Novartis and Nestlé taking any action in violation of those and other legally protected rights, and in the event the Challenged Transaction closes, monetary damages in favor of the Class arising from the serial breaches of duty of Novartis, Nestlé, Vasella and the other director defendants.

<u>JURISDICTION AND VENUE</u>

11.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(c), in that diversity exists between Plaintiffs and each of the Defendants and the amount in controversy exceeds $5,000,000 for the Class exclusive of interests and costs.

12.    The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in this District or is an individual who either is present in New York for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (a) those of the Defendants who are aliens may be sued in any District; (b) a substantial portion of the

transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business in this District and engaging in activities having an effect in this District, including the issuance of Alcon's publicly held shares *exclusively* on the NYSE.

## THE PARTIES

### Plaintiffs

14.     Plaintiff Oklahoma Firefighters Pension & Retirement System ("Oklahoma Firefighters") is a retirement fund organized and existing under the laws of the State of Oklahoma. Oklahoma Firefighters' principal place of business is in Oklahoma City, Oklahoma. Oklahoma Firefighters is a current shareholder of Alcon.

15.     Plaintiff City of Monroe Employees' Retirement System ("City of Monroe") is a retirement fund organized and existing under the laws of the State of Michigan. City of Monroe's principal place of business is in Monroe, Michigan. City of Monroe is a current shareholder of Alcon.

16.     Plaintiff City of Westland Police & Fire Retirement System ("City of Westland") is a pension fund organized and existing under the laws of the State of Michigan. City of Westland is a current shareholder of Alcon.

17.     Plaintiff Massachusetts Bricklayers and Masons Trust Funds ("Massachusetts Bricklayers") is an institutional investor that manages funds for its pension plan participants and beneficiaries. Massachusetts Bricklayers is a current shareholder of Alcon.

18.     Plaintiff Boilermakers Lodge 154 Retirement Plan ("Boilermakers") is a retirement fund organized and existing under the laws of the Commonwealth of Pennsylvania.

Boilermakers' principle place of business is in Pittsburgh, Pennsylvania.  Boilermakers is a current shareholder of Alcon.

19.     Plaintiff Erica P. John Fund, Inc. ("John Fund"), formerly known as the Archdiocese of Milwaukee Supporting Fund, is a charitable foundation organized and existing under the laws of the State of Wisconsin.  The John Fund's principal place of business is in Milwaukee, Wisconsin.  The John Fund is a current shareholder of Alcon.

**<u>Defendants</u>**

20.     Defendant Novartis is a multinational pharmaceutical company based in Basel, Switzerland with offices located throughout the U.S., including New York City.  Novartis had over $53 billion in revenues in 2008, and roughly $36.2 billion in 2008 sales. Novartis is one of the largest healthcare companies in the world and a leading giant among pharmaceutical companies.   Novartis was created in 1996 from the merger of Ciba-Geigy and Sandoz Laboratories.

21.     Defendant Nestlé is a multinational packaged foods company founded and headquartered in Vevey, Switzerland, and listed on the SWX Swiss Exchange with a market capitalization of over 87 billion Swiss francs.  Nestlé originated in 1905 and currently manufactures and sells a wide range of products around the world in a number of markets.

22.     Defendant Alcon is a corporation organized and existing under the laws of Switzerland.  Alcon trades publicly and exclusively on the NYSE under the symbol "ACL".  The Company's registered place of business is in Hünenberg, Switzerland.  Alcon's principal U. S. offices are located at 6201 South Freeway, Fort Worth, Texas.  According to the Company's public filings, Alcon is a world leader in high quality ophthalmology products.  In 2008, Alcon had over $6.29 billion in sales.

23.     Daniel Vasella ("Vasella") has served as a director of Alcon since July 2008, following Novartis' acquisition of 25% of Nestlé's Alcon shares (the "First Stage Acquisition"). He is the Chief Executive Officer of Novartis and the nominee of Novartis to the Alcon Board of Directors.  Vasella, with Novartis' Chief Financial Officer Raymond Breu ("Breu"), engineered the Nestlé Deal and Challenged Transaction on behalf of Novartis.  Vasella is a citizen of Switzerland.

24.     Cary R. Rayment ("Rayment") is the former Chairman, President, and Chief Executive Officer of Alcon, retiring in March 2009.  Since that time, he has been the non-executive Chairman of Alcon's Board of Directors.  He is a resident of Washington.

25.     Kevin J. Buehler ("Buehler") has served as President and Chief Executive Officer of Alcon since April 2009, and as a member of the Board of Directors since May 2009.  Buehler began his career with Alcon in 1984 and has since served in various capacities at Alcon.  He is a resident of Texas.

26.     Werner J. Bauer ("Bauer") has served as a director of Alcon since March 2002. He is one of five nominees of Nestlé to the Alcon Board of Directors.  Bauer has served as Executive Vice President, Technical, Production, Environment and R&D of Nestlé since May 2002 and in February 2007, was appointed Chief Technology Officer, Head of Innovation, Technology R&D for Nestlé.  Bauer began his career with Nestlé in 1990 as Head of Nestlé Research Center in Lausanne, Switzerland and has since served in various capacities at Nestlé. He is a citizen of Switzerland.

27.     Paul Bulcke ("Bulcke") has served as a director of Alcon since May 2008.  He is one of five nominees of Nestlé to the Alcon Board of Directors.  Bulcke has served as a director of Nestlé and as Nestlé's Chief Executive Officer since April 10, 2008.  Bulcke began his career

with Nestlé in 1979 and has since served in various capacities at Nestlé.  He is a citizen of Belgium.

28.     Francisco Castañer ("Castañer") is Vice Chairman of the Alcon Board of Directors and has served as a director of Alcon since July 2001.  He is one of five nominees of Nestlé to the Alcon Board of Directors.  Castañer has served as Nestlé's Executive Vice President, Pharmaceutical and Cosmetic Products, Liaison with L'Oréal S.A., Human Resources and Corporate Affairs since 1997.  Castañer began his career with Nestlé in 1964 and has since served in various capacities at Nestlé.  He is a citizen of Spain.

29.     James Singh ("Singh") has served as a director of Alcon since July 2008 following Novartis' First Stage Acquisition of Nestlé's Alcon shares.  He is one of five nominees of Nestlé to the Alcon Board of Directors.  Singh has served as Nestlé's Executive Vice President and Chief Financial Officer since 2008.  Singh began his career at Nestlé in 1977 and has since served in various capacities at Nestlé.  He is a citizen of Canada.

30.     Hermann Wirz ("Wirz") has served as a director of Alcon since May 2009.  He is one of five nominees of Nestlé to the Alcon Board of Directors.  Wirz serves as Nestlé's Chief Accounting Officer.  Wirz began his career with Nestlé in 1972 and has since served in various capacities at Nestlé.  He is a citizen of Switzerland.

31.     Defendants Vasella, Rayment, Buehler, Bauer, Bulcke, Castañer, Singh, and Wirz are referred to herein as the "Director Defendants."

**The Non-Defendant Independent Directors of Alcon**

32.     Thomas G. Plaskett ("Plaskett") has served as a director of Alcon since May 2003 and is not affiliated with either Novartis or Nestlé nor an officer or employee of Alcon.  He is a member of the Independent Committee of Alcon's Board of Directors.

33.    Lodewijk J.R. de Vink ("de Vink") has served as a director of Alcon since March 2002 and is not affiliated with either Novartis or Nestlé nor an officer or employee of Alcon.  He is a member of the Independent Committee of Alcon's Board of Directors.

34.    Joan W. Miller ("Miller") has served as a director of Alcon since May 2009 and is not affiliated with either Novartis or Nestlé nor an officer or employee of Alcon.  She is a member of the Independent Committee of Alcon's Board of Directors.

35.    Messrs. Plaskett and de Vink and Ms. Miller are sometimes referred to collectively herein as the "Independent Directors" or the "Independent Committee."

## SUBSTANTIVE ALLEGATIONS

### A.    Alcon, Novartis and Nestlé's U.S. Ties

36.    While incorporated in Switzerland, Alcon has substantial ties to the U.S..  In 2002, Nestlé chose to launch the initial public offering of Alcon on the NYSE (and no other exchange), where the Company's stock has traded primarily among U.S. investors, ever since. According to Alcon's website, the Company's "largest offices and facilities" are in Forth Worth, Texas, and the Company also has facilities in California, Pennsylvania and West Virginia. Alcon's consumer products are shipped and marketed throughout the U.S., and Alcon currently appears in litigation in federal courts in California, Colorado, Indiana, Louisiana, New York, Pennsylvania and Texas.

37.    Alcon also regularly makes presentations at analyst and shareholder conferences across the U.S.  For example, on December 1, 2009, Alcon presented at the Piper Jaffray Healthcare Conference in New York City.  Most recently, on January 12, 2010, Defendant Buehler spoke on behalf of Alcon concerning the Challenged Transaction at a JP Morgan healthcare conference in San Francisco, California.

38.     Additionally, Alcon's public filings indicate that the Company draws on the expertise and the resources of KPMG LLP with respect to the U.S. GAAP financial statements of Alcon and that KPMG LLP was also retained for filings to be made by Alcon with U.S. regulatory authorities.  KPMG LLP's headquarters are also in New York City.

39.     Furthermore, each of the Independent Directors resides and/or works in the U.S. Plaskett is Chairman of Fox Run Capital Associates in Irving, Texas, de Vink works for Blackstone in New York City, and Miller works in Boston, Massachusetts.  Most of Alcon's senior management are also U. S. residents.

40.     As of September 9, 2009, according to Thompson Reuters, Alcon's publicly-traded shares on the NYSE were held by roughly 75% U.S. investors.  Additionally, 87% of Alcon's minority-held shares are owned by U.S. residents.  Accordingly, the vast majority of Alcon's minority shareholders – here, the Class – are U. S. citizens.  The harm that will be caused by Defendants, should the Challenged Transaction be consummated, will be suffered largely in the U. S. by U. S. shareholders.

41.     Defendant Novartis' ties to the U.S. are also substantial.  In addition to marketing and distributing its pharmaceutical products, such as Valium and Ritalin, and over-the-counter remedies, such as Excedrin, throughout the country, Novartis has production facilities and other business operations in California, Colorado, Georgia, Massachusetts, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, and Washington, D.C.

42.     Novartis is currently engaged in litigation in this Court and elsewhere throughout the U.S., particularly availing itself of U.S. patent protection for the majority of its best selling products.  Indeed, in this District alone Novartis has filed several patent infringement complaints.

43.     Novartis' American Depository Shares (ADSs) trade on the New York Stock Exchange, and the agreements underlying them are construed in accordance with New York law. Each Novartis ADS entitles the holder thereof to one share of Novartis common stock.

44.     Nestlé also has substantial ties to the U.S. in various other ways in addition to its holdings in Alcon,  Nestlé has substantial operations throughout the U.S. through its ownership of such iconic consumer brands as Purina, Gerber, Haagen-Dasz, Stouffers, as well as Nestlé's wide array of confectionary products.  Nestlé's ADSs trade on the over-the-counter exchanges in the U. S., and each ADS represents one share of Nestlé stock as traded in London, Paris and Zurich.  The agreements underlying the ADSs are also governed by New York law, and Nestlé is a party to lawsuits in this Court and elsewhere in the U.S.

45.     The Challenged Transaction, more so than the typical corporate deal, rests on the advice and structural gamesmanship of corporate advisors.  In connection with the Challenged Transaction, Novartis and Nestlé have each engaged the services of legal counsel, brokers and/or investment advisers whose operations are headquartered in or affiliated with activities in New York City.  In the case of Novartis, it has engaged Wachtell, Lipton, Rosen & Katz, which is headquartered in New York City and Allen & Overy, whose website states that its "New York office is the principal hub of Allen & Overy's Global U.S. Practice."  Likewise, Nestlé has engaged Cravath, Swaine & Moore, which is also headquartered in New York City.  The financial advisors hired by each of the Defendants are also based and located in New York City.

**B.      Background of the Nestlé Deal**

46.     Alcon was founded in 1945 in Fort Worth, Texas by two physicians: Robert Alexander and William Conner.  Nestlé acquired Alcon in 1978 and retained 100% ownership until March 2002, when the company conducted an initial public offering (IPO) of about 25% of Alcon's shares, with Nestlé retaining ownership of the balance of Alcon's stock.  Alcon's

common stock started trading on the NYSE on March 21, 2002, and continues to trade exclusively on the NYSE.

47.    Following negotiations, Nestlé and Novartis entered into an agreement in April 2008 (the "Purchase and Option Agreement"), under which Novartis obtained the right to immediately purchase approximately 74 million shares of Alcon stock owned by Nestlé through the First Stage Acquisition and an option to purchase the remaining approximately 156 million shares of Alcon stock owned by Nestlé starting on January 1, 2010 (the "Second Stage Acquisition").

48.    Following the completion of the First Stage Acquisition in July 2008, Nestlé remains Alcon's majority shareholder, holding about 52.2% of Alcon. Novartis owns a minority interest of 24.85% of Alcon, but through its relationship with Nestlé shares effective control of the Company. Novartis retains its option to proceed with the Second Stage Acquisition through July 31, 2011. No provision in the Purchase and Option Agreement requires Novartis to acquire the publicly traded shares of Alcon following the Second Stage Acquisition.

49.    As outlined in the Purchase and Option Agreement, Novartis' options to proceed with the Second Stage Acquisition are as follows: (i) Novartis has an option to buy Nestlé's remaining Alcon shares at a fixed price of $180 per share and (ii) Nestlé has an option to sell its remaining Alcon shares to Novartis at the lower of Novartis's call price of $180 per share or at a 20.5% premium above the market price of Alcon shares, which would be calculated as the average price of Alcon shares during the week preceding the exercise date of the put option. As an economic matter, once Alcon shares traded in the market at a price within 20.5% of $180 per share (as has been the case since about mid-October 2009), Nestlé became economically disinterested, since Novartis can purchase the shares at $180 per share (so that Nestlé cannot

enjoy any further upside benefits) and Nestlé can sell the shares at that price without bearing any downside risk in Alcon.

50.     On April 6, 2008, Nestlé and Novartis also executed a Shareholders Agreement (the "Shareholders Agreement") that gives Novartis effective control over Alcon.     The Shareholders Agreement provides for the expansion of the Alcon Board of Directors from eight to ten members upon the completion of the sale, with one of the additional members designated by Nestlé and one designated by Novartis.  The Shareholders Agreement created arrangements to keep control of Alcon strictly to Novartis and Nestlé.  Specifically, these parties caused Alcon's Board of Directors to comprise ten directors (which were subsequently increased to eleven).  Of these ten seats, one was to be nominated by Novartis, and five were to be nominated by Nestlé. In addition, one director was to be Alcon's Chief Executive Officer.  Finally, three directors were to be "individuals nominated by the Nominating/Corporate Governance Committee that qualify as independent directors and who are not Novartis or Nestlé designees."

51.     Alcon's shareholders voted to expand the Alcon board and elected two new directors at Alcon's annual general meeting held on May 6, 2008 in Zug, Switzerland. Defendant Singh, Nestlé's Executive Vice President and Chief Financial Officer and Nestlé's designee, and defendant Vasella, Novartis' Chairman and Chief Executive Officer and Novartis's designee, were elected to these two director positions and joined Alcon's Board of Directors upon the closing of the First Stage Acquisition on July 7, 2008.

52.     The Shareholders Agreement also contains provisions relating to Alcon's corporate governance, the relationship between Novartis and Nestlé as shareholders of Alcon, and certain existing arrangements between Nestlé and Alcon.  In particular as described in a July

14, 2008 Form SC 13D filed by Novartis with the Securities and Exchange Commission

("SEC"),

> the Shareholders Agreement requires Nestlé and Novartis to vote their Shares to
> elect two additional individuals, one designated by Novartis (the "<u>Novartis
> Designee</u>") and one designated by Nestlé, to the Board as described above, and to
> use their reasonable ***best efforts to cause the Board to call and hold an***
> ***extraordinary general meeting of the shareholders of [Alcon] prior to the***
> ***completion of the Second Stage Acquisition and to vote their Shares to elect five***
> ***individuals designated by Novartis as directors of [Alcon]. Nestlé separately***
> ***agreed to use its reasonable best efforts to cause the five directors on the Board***
> ***designated by Nestlé (the "<u>Nestlé Designees</u>") to resign at that time***.

(Emphasis added.)

53.     The Shareholders Agreement also contains various provisions highlighting that

even as Nestlé retains a majority stake in Alcon, Novartis exercises effective control over that

stake.  For example, the Shareholders Agreement provides:

> to the extent consistent with applicable laws, that ***the Nestlé Designees shall***
> ***consult with any directors designated by Novartis prior to any Board meetings***
> ***and prior to any Board action being taken.  Nestlé further agreed, if requested by***
> ***Novartis, to use its reasonable best efforts to cause the Nestlé Designees to either***
> ***vote against certain significant actions or to submit such significant actions to a***
> ***vote of the shareholders*** of [Alcon] (so long as, in either case, such action would
> not violate the Nestlé Designees' fiduciary duties to the Issuer under Swiss
> corporate law).

(Emphasis added.)

54.     Indeed, Section 2.2 of the Shareholders Agreement requires Nestlé to accept

instructions from Novartis (meaning that Nestlé will cause its board nominees to act as Novartis

wishes and Nestlé will vote its shares as Novartis wishes) with respect to a wide range of critical

corporate actions, including:

> (i)  acquisitions and dispositions that are material to the Company and its
> Subsidiaries, taken as a whole;

(ii) the entry by the Company or any of its Subsidiaries into intellectual property licensing transactions with any Person (other than the Company or any of its Subsidiaries) that are material to the Company and its Subsidiaries, taken as a whole;

(iii) any change to the capital structure of the Company (as it exists on the First Stage Closing Date) (including any dividends, distributions or stock repurchases other than Normal Dividends (as defined in the Purchase and Option Agreement) and any changes in the voting or other rights of the Common Shares or any other class of capital stock);

(iv) any material operational restructuring of the Company and its Subsidiaries (as they exist on the First Stage Closing Date);

(v) the entry by the Company or any of its Subsidiaries into material non-compete agreements in the pharmaceutical or contact lens businesses of the Company and its Subsidiaries;

(vi) the entry into any material tax sharing agreement, material tax settlement agreement, materialadvance pricing agreement, or any other material agreement, the principal purpose of which is to create or alter a material tax liability of the Company or to alter the long-term tax position of the Company;

(vii) any amendment (other than as required by Legal Requirements applicable to the Company) to Company employee compensation plans or adoption of new Company employee compensation plans (other than any retention arrangement appropriate to protect the Company's interest in the context of the transactions contemplated by this Agreement or the Purchase and Option Agreement) if such amendments and/or adoptions

are likely to materially increase the employee compensation cost to the Company and its Subsidiaries;

(viii) the listing of the Common Shares or other securities of the Company on any stock exchange other than the New York Stock Exchange; and

(ix) any amendment of Article III, Section 3 or Annex 3.3(k) of the Company's Board of Directors Organizational Regulations concerning matters subject to Board approval.

55.     Accordingly, the Shareholders Agreement not only provides for the eventual replacement of Nestlé's designees with those selected by Novartis, but also requires Nestlé's designees to act on Novartis' behalf during the remainder of their service on the Alcon Board and compels Nestlé to vote its shares as per Novartis' desires on virtually any matter material to the Company.  Indeed, in a Schedule 13D which Novartis filed with the SEC on January 4, 2010, Novartis stated "Novartis also has the right to direct Nestlé to vote . . . against certain significant transactions submitted to a vote of the shareholders of [Alcon]."

56.     Moreover, certain of the restrictions listed in the Shareholders Agreement, like the restriction against Alcon listing its shares "on any stock exchange other than the New York Stock Exchange," plainly evidences a pre-existing strategy by Novartis to deny Alcon's minority shareholders and the Independent Directors from enjoying the legal protections that could be made available in a Novartis acquisition by simply listing Alcon shares on a Swiss exchange.

57.     In sum, Nestlé, Novartis and Alcon were aware that the Purchase and Option Agreement put control of Alcon in Novartis' hands as well as Nestlé's.  Novartis would control the Alcon Board by way of the Shareholders Agreement and hold the right to become the Company's majority shareholder.

C.      **Alcon's Organizational Regulations**

58.     Alcon's Organizational Regulations are the contract between Alcon and its shareholders by which the role and function of the Board of Directors is established.  As they require, the Organizational Regulations have been translated from the original German and made publicly available by Alcon to the public shareholders who are induced to purchase Alcon shares by virtue of the protections promised to them by Alcon's corporate governance documents.

59.     The Organizational Regulations require that a change in control of the Company be approved by a majority of the Independent Directors.  This rule, quoted below, served to allay fears of Alcon's public investors who were rightfully concerned with Novartis' and Nestlé's ability to control the Company and its strategic alternatives.

60.     Alcon, with Defendant Vasella sitting on the Board along with various Nestlé representatives, has made numerous public representations that the provisions in the Organizational Regulations protect the Company's minority shareholders in the event of a possible buyout from a majority shareholder.

61.     In fact, Article V, Section 5 of the Company's Organizational Regulations was specifically drafted to protect the rights of Alcon's minority shareholders against the possible encroachments of a majority shareholder, stating as follows:

**Section 5.  Independent Director Committee.**

If any of the following transactions is proposed to be taken by the Company, the Board shall form a special committee of no less than three independent directors as defined under the NYSE Rules who shall be responsible for protecting the interests of the minority shareholders of the Company.  ***The Board shall only resolve such matters if a majority of the members of Independent Director Committee so recommends.***  Such matters are:

> ***(a) a proposed merger, takeover, business combination or related party transaction of the Company with the Majority Shareholder or any group company of the Majority Shareholder***;

> *(b) a proposed bid for the shares of the Company by any entity owning a majority of the Company's outstanding voting rights;*
>
> (c) a proposed repurchase by the Company of all the shares not owned by an entity owning a majority of the outstanding voting rights of the Company; or
>
> (d) any change to the powers and duties of the Independent Director Committee.

(Emphases added.)

62.      "Majority Shareholder" as used in the Organizational Regulations means not only Nestlé, but also any other majority shareholder.  Article V, Section 4, for example, defines the rights of Nestlé to designate a member of the Nominating and Corporate Governance Committee for "as long as Nestlé remains as the Majority Shareholder."  By using Nestlé and Majority Shareholder in the same sentence in this manner, the Organizational Regulations make clear that the Majority Shareholder could be another party, since the language is otherwise senseless.

63.      Further, Alcon has paraphrased the Organizational Regulations in its public filings with the SEC.  These Form 20-Fs were filed with consent of Alcon's Board, including Vasella and Nestlé's representatives.  Alcon's 20-F filed on March 17, 2009, states simply that the Independent Director Committee would "evaluate and decide upon…a proposed merger, takeover, other business combination or related party transaction of Alcon with its majority shareholder."  The 20-F says nothing about the majority shareholder being Nestlé, and does not define majority shareholder at all.  The public campaign by Novartis to suggest the protections of the Organizational Regulations do not apply to it is not only evidence of its bad faith in the Challenged Transaction but is also a concession that the regulations indeed prohibit the squeeze-out Novartis has planned.

64.      Article VIII, Sections 1, 2 and 3 of the Organizational Regulations provide rules

for situations—like here – where a conflict of interest exists among Alcon Board members. Article VIII, generally, requires conflicted Board members to abstain from voting on matters implicating a conflict of interest and requires the Board to implement a process that will ensure no corruption from conflicts of interest between the Board and the Company.  These sections state, in pertinent part:

**Conflict of Interest**

**Section 1.  Definitions.**

For purposes of Articles VIII and IX:

(a) **Conflicting Interest** shall mean any interest a Board member may have with respect to a matter due to the fact such Board member or a Related Person (as hereinafter defined) has a financial or non-financial interest (including but not limited to an interest with respect to such matter for a Related Person that is detrimental to the Company or at conflict with the interests of the Company (**Competitive Interest**)) in, or is otherwise closely linked to, the matter, and such interest is of such significance to the Board member or a Related Person that the interest would reasonably be expected to interfere with the Board member's judgement if he were called upon to participate in discussions of the Board or any Board Committee relating to, or vote on, the matter.

\*   \*   \*   \*

**Section 2.  General.**

A Board member who believes that he may have a Conflicting Interest (**Conflicting Director**) which involves the Company shall inform the Chairman of the fact and the nature of the Conflicting Interest as soon as he becomes aware of such Conflicting Interest. In the event that the Chairman becomes aware of a Board member's potential Conflicting Interest, the Chairman shall promptly contact the potentially Conflicting Director and discuss with the Conflicting Director the nature and extent of such Conflicting Interest.

Upon receipt of the notice that a Board member has a Conflicting Interest, or upon the Chairman becoming aware of a Conflicting Interest of a Board member, the Chairman will implement the appropriate measures to ensure that the interests of the Company are adequately protected. The Chairman will resolve to what extent the Conflicting Director shall be excluded from information and deliberations relating to the matter giving rise to the Conflicting Interest. At the next meeting of the Board, the Chairman shall inform the Board about the

Conflicting Interest and the measures taken in order to adequately protect the Company. To the extent that a Board member disagrees with the conclusion that a Conflicting Interest exists or with the measures taken to address such Conflicting Interest, he may request that the Board consisting of non-Conflicted Directors only shall resolve as to the issue of the existence of a Conflicting Interest and the measures to be taken.

In the event that the Chairman is the Conflicting Director, the Chairman or any Board member who becomes aware of the Conflicting Interest shall inform the Board about the Conflicting Interest and, following a discussion with the Chairman, the members of the Board other than the Chairman shall determine the appropriate measures to take to protect the Company's interests and determine to what extent the Chairman shall be excluded from pertinent information, the deliberations and the voting relating to the matter giving rise to the Conflicting Interest.

*      *      *

**Section 3.  Duty to Abstain.**

***Members of the Board shall abstain from exercising their voting rights in matters involving a Conflicting Interest***; it being understood that they shall abstain from participating in, or receiving any information in respect of, any item or matter brought before the Board or any Board Committee in which they may have a Competitive Interest. If a Board member is required to abstain from voting in a matter, he shall not be counted in the quorum of the meeting in question. In addition, such Board member, as well as the other members of the Board, shall use their respective best efforts to ensure that the Board member with the Conflicting Interest does not receive any non-public, proprietary and/or confidential information with respect to such matter. In particular, and without limitation to the foregoing, a Board member shall not vote or be counted in the quorum of the meeting in respect of any resolution concerning the following matters:

> (a) his own appointment, including fixing and varying its terms;

> (b) the termination of his own appointment as the holder of any office with the Company or any other company in which the Company holds an equity interest;

> (c) any transaction in which he or any Related Person is an interested party.

65.    Finally, Novartis and Nestlé are not entitled to simply abolish or rewrite the Organizational Regulations without regard to the protections afforded to Alcon's minority

shareholders.  For example, Article XI, Section 3 of the Organizational Regulations provides unambiguously that "[a]ny amendment affecting the powers and duties of the Independent Director Committee shall only be valid if approved by a majority of the members of such committee."  Having promulgated the Organizational Regulations, Alcon and the Controllers must act pursuant to them.

       D.      **The Challenged Transaction is Structured to Thwart the Protections Guaranteed to Alcon's Minority and Violates Defendants' Prior Promises**

66.  On or about January 1, 2010, Novartis exercised its option to complete the Second Stage Acquisition of the Purchase and Option Agreement.  This acquisition, which is subject to required regulatory approvals, is expected to be completed in the second half of 2010 and will raise Novartis' ownership of Alcon's outstanding equity to approximately 77%.

67.  On January 4, 2010, Novartis publicly announced its intention to purchase the remaining 23% stake in the Company held by Alcon's public shareholders.  In addition, Novartis made clear that there was little, if anything, the Alcon Independent Directors could do to stop Novartis from imposing the terms of the Challenged Transaction upon Alcon's minority shareholders.  Alcon's Independent Directors have essentially conceded that Novartis had effectively structured the Challenged Transaction so to avoid the protections afforded to Alcon's minority shareholders, stating "Novartis appears to be attempting to circumvent the minority protection principles . . . ."

68.  The Challenged Transaction was purposefully made using Novartis stock for consideration so as not to trigger the tender offer regulations of the SEC.  On January 3, 2010, Novartis sent a letter to Cary Rayment, Chairman of the Alcon Board, offering to purchase all of the publicly-held Alcon stock.  The letter proposed "a fixed exchange ratio of 2.80 Novartis

shares for each outstanding Alcon share." Under the terms of the Challenged Transaction, Alcon's shareholders would have the choice of receiving Novartis ADSs.

69. Based on the Novartis closing share price of CHF 56.50 on December 30, 2009 (the last trading day before the offer letter), the Challenged Transaction valued each public share of Alcon at $153 on the day it was announced. Moreover, it only represents a 7% premium to the "April 2008 unaffected price of $143," which Novartis uses to calculate the blended premium being paid to Nestlé for its Alcon shares. Notably, Novartis' CFO Breu disclosed during an analyst conference call on January 4, 2010 that Novartis "estimated" an "unaffected stock price" of $137 for the purpose of calculating a purported 12% premium that Alcon's minority shareholders would receive for their shares pursuant to the Challenged Transaction. Put another way, Novartis claims the Challenged Transaction offers a 12% premium because Novartis has, unilaterally and with no logical or sound economic methodology, determined that Alcon shares would be worth $137 per share had Novartis not bought its stake in the Company. This form of pseudo, unprincipled valuation cannot be credited and is itself further evidence of Novartis' disregard for Alcon's minority shareholders.

70. The "premium" offered by Novartis, even if its "unaffected stock price" methodology passed the proverbial straight face test, is grossly inadequate. For comparison, since 2000, majority stockholders of public companies who offer to acquire the companies' remaining minority held shares have paid the minority stockholders, on average, approximately 32% more than the minority shares were worth on the market before the acquisition was announced. Minority stockholders, in short, always receive a premium price for their shares, not a discounted price such as that which Novartis promises.

71.     Further, the offer to Alcon's public shareholders does not have the certainty of value that Nestlé is receiving for its stake (since Nestlé is selling its shares for cash).  Because the Challenged Transaction contains a fixed exchange ratio – that is, no downside protection for a drop in Novartis stock price - the value of Novartis' offer to Alcon's public shareholders is volatile and has already lost significant value.  Novartis' stock has declined since the Challenged Transaction's announcement.  Since the Challenged Transaction was announced, Novartis stock has traded as low as $52.33 per share, corresponding to consideration of only approximately $146.5 for each share of Alcon—representing a $33.5 (or 18.6%) discount to the consideration Novartis will pay to Nestlé for its 52% stake in Alcon.

72.     Moreover, the market clearly views the Challenged Transaction as inadequate.  Alcon's share price opened over $155 on January 21, 2010.  Novartis continues to publicly tout, however, that neither the Independent Directors nor Alcon shareholders have any ability to stop Novartis' devious plan to impose a price of its choosing in the Challenged Transaction.  As a result, Alcon's stock price will only remain above the implied value of the Novartis shares to be paid in the Challenged Transaction so long as hope remains that this Court will stop Novartis' improper actions and will protect the minority rights granted to Alcon's shareholders by law, the Organizational Regulations, and the Company's prior public promises.

73.     Novartis contends that it can push through the Challenged Transaction once it takes majority control of Alcon from Nestlé because, under Novartis' view of Swiss law, mergers require approval of two-thirds of shareholders and a simple board majority.  Specifically, in a January 4, 2010 analyst call, Breu stated "the merger requires then the majority approval by the Boards of both Alcon and Novartis and two-thirds approval of Alcon and Novartis shareholders voting at their AGM post-closing," and then snidely continued,

"Hopefully, the [sic] Novartis would clearly vote its share in favor of such a merger."  As a result, Alcon's public shareholders will never get an opportunity to have a meaningful voice before being forced to part with their property for the price offered.  As admitted by defendant Vasella, "the minority shareholders have no options left."

74.     Also during the conference call, in response to questions by Bernstein research analyst Tim Anderson, Vasella made Novartis' intentions even more explicit:

Tim Anderson, Sanford Bernstein – Analyst:

The price that you are offering for the minority stake obviously sets you up for somewhat of a conflict with those shareholders because it's below the current price.  I guess Alcon has hired an outside consultant to evaluate your bid.  If those consultants come back and say the price is too low, what do you do then?  If you raise the price would that have to be equity that you would issue to do that or would you actually use cash or debt?  And on this same topic is there a certain level of accretion or dilution that you need to reach for you to pursue the minority interest stake or is the metric you really think about more strategic in nature and not really focused as much on accretion and dilution for that minority interest stake?

Dan Vasella, Novartis - Chairman & CEO:

Thank you, Tim.  Maybe just we need to clarify first that both companies are Swiss companies and so we follow Swiss merger law.  ***So in principle what you need for a merger is the agreement of the Board of Directors of both companies and you need approval by two-thirds of the shareholders of both companies. Now as you think it through we will have 77% of the shares upon closing the Nestlé deal which will also give us the majority on the Board.  We also will have more than a two-thirds majority on the shares and we can vote in favor of our proposal according to Swiss law.  And so we need to persuade then the Novartis shareholders that it's also fair to them.***

75.     Thus, "Novartis appears to be attempting to circumvent the minority protection principle . . . by claiming that the Alcon minority shareholders are neither accorded minority protections under the Swiss Takeover Code nor the rules under the NYSE," as the Alcon Independent Director Committee said in a statement concerning the Challenged Transaction.

76.     Further, during an analyst conference call given by Plaskett on January 20, 2010,

Plaskett said:

> As you know, this morning the Committee issued a press release announcing its response to Novartis's proposal to acquire the minority shareholders of Alcon. ***We have found the proposal to be grossly inadequate and have determined that the financial analysis underpinning Novartis's unilateral proposal is fundamentally flawed***.
>
> ***We also find the coercive tactics deployed by Novartis offensive and believe that they demonstrate a profound disrespect for Alcon's minority shareholders***, many of whom are employees that built Alcon into the highly successful Company that it is today.
>
> …

77.     Plaskett stated in a January 20, 2010 Press Release (Annexed hereto as Exhibit B)

that the Independent Committee believed that "***…Alcon's organizational documents specifically***

***protect minority rights by requiring, among other things, that Directors that are truly***

***independent approve transactions such as the one we are dealing with here.***"

78.     During the question-and-answer session of the conference call, Plaskett had the

following exchanges with analyst:

> Q:      Matt Miksic - Piper Jaffray – Analyst:
>
> …There is one question, and I agree with the other callers that it's important to advocate on behalf of minority shareholders. But I guess I'm anticipating in the debate with Novartis some element of discussion of what the business conditions were under which the original proposal was struck; and what the business conditions are now, looking forward, and the outlook for Alcon…
>
> A:      Tom Plaskett - Alcon, Inc. - Chairman - Independent Director Committee:
>
> …***We strongly believe that the stand-alone value of the Company dramatically exceeds Novartis's proposal***. And that's validated, we think, because the market has consistently recognized and awarded Alcon a premium for its attractive fundamentals, industry leadership, and outperformance of quarterly earnings expectations 26 out of 29 times since its 2002 IPO…
>
> Q:      Matt Miksic - Piper Jaffray – Analyst:
>
> [E]ven accounting for what would be a slightly lower growth trajectory over the next five years, say, than over the last five years -- even accounting for that, ***your advisors and***

*your analysis would tell you that the base value of the offer as defined by Novartis still grossly underestimates the value of the stock*.

A:      Tom Plaskett - Alcon, Inc. - Chairman - Independent Director Committee:

*Yes, and I think it's important to reemphasize that the valuation was based on not only the past performance, but the anticipated financial performance of the Company*, including its very strong growth prospects, and also merger synergy opportunities, which are available if this merger is consummated.

Q:      Sachin Shah - Capstone Global Markets – Analyst:

Second question is in regards to the stock of Novartis. Are you just opposed to receiving stock, or you want a fixed amount, essentially meaning cash?

A:      Tom Plaskett - Alcon, Inc. - Chairman - Independent Director Committee:

*I think the form of consideration is another one of the elements that we considered to be unsatisfactory*; and hopefully during the process going forward that certainly will be part of the discussion…

Q:      David Buck - Buckingham Research Group – Analyst:

In the letter to Dan Vasella, you mention the implication that Novartis made about replacing the Board. Just wanted to get a sense of what you feel or what your legal advisers feel that your protections may be about the Independent Committee itself being replaced after the transfer of step two?

A:      Tom Plaskett - Alcon, Inc. - Chairman - Independent Director Committee:

*First, we don't believe that Novartis can do this.* If you examine Article 11, Section 3 of the Organizational Regs, that is what protects the Independent Committee structure. And it does so by providing any amendment that affects the powers and duties of the Independent Directors or any change to Organizational Regulations that would serve to undermine the principles behind minority shareholder protections *would require the approval of the Independent Directors. So on that basis, we do not believe that they have the ability to do this.*

Q:      David Buck - Buckingham Research Group – Analyst:

*So effectively, you think that you would have to agree to replace yourselves, in other words?*

A:      Tom Plaskett - Alcon, Inc. - Chairman - Independent Director Committee:

***Something like that.*** And also, if for some reason that were to happen, any new Independent Directors are still bound by the same independence requirements and analysis and responsibilities that we have today. So those don't change.

If the faces change, okay; but they still have a legal obligation to perform the duties of Independent Directors and not necessarily because they've been selected or hired by Novartis.

Q:      Jason Miller - Twin Capital – Analyst:

It seems clear that the Committee has rights. What do you think Novartis's true intentions are?

A:      Tom Plaskett - Alcon, Inc. - Chairman - Independent Director Committee:

Well, I can't speak for Novartis. They made the proposal, and so I would suggest that that perhaps it is a question you might want to ask of them. I suppose my fundamental perspective here is that ***this is a little bit like the situation of a playground bully who takes half of your lunch money from everybody to play and then splits it up with his best buddy. This so far has been a process where – why is Novartis doing this? Because they can do it…***

79.      Novartis has therefore taken the position that neither Swiss law nor the NYSE's regulations provide any barrier to its unilateral completion of the patently unfair Challenged Transaction.

80.      Furthermore, according to an Alcon press release on January 4, 2010, the Independent Director Committee was formed after Novartis and Nestlé entered into the Purchase Option Agreement and Novartis acquired a 25% interest in the Company pursuant to the First Stage Acquisition for the specific purpose of protecting public shareholders from the sort of abusive situation which they now face.  This release stated, in part, the following:

> ***Following Novartis' initial purchase from Nestlé of an approximately 25% stake in Alcon, the Alcon Board of Directors recognized the need for the establishment of a standing committee of independent directors whose stated purpose is to protect the minority shareholders*** in connection with a number of transactions, including related party transactions between Alcon and major shareholders of Alcon.  This action was approved by the full Alcon Board of Directors in December 2008.

(Emphases added.)

81.     And in a second release dated the same day, the Independent Directors reiterated this point by stating that:

> *The Alcon Board of Directors established an Independent Director Committee of the Alcon Board of Directors in 2008 in connection with Novartis' initial purchase of approximately 25% of the Alcon shares from Nestlé in order to protect the interests of the minority holders of publicly-held Alcon shares in transactions such as Novartis' merger proposal . . .*

(Emphases added.)

82.     The current members of the Independent Director Committee, Messrs. Plaskett and de Vink and Ms. Miller, have each indicated that consideration offered in the Challenged Transaction is inadequate and they will not support it.   Thus, as of the date hereof, the Challenged Transaction lacks the approval of *any*—much less a majority of—Alcon's Independent Directors.

83.     Notwithstanding the lack of Independent Directors' support, Defendants have stated publicly that they intend to go forward with the Challenged Transaction without regard to the positions of the Independent Directors and whether or not the Independent Directors will approve it.   Defendant Vasella has asserted that once Novartis possesses Nestlé's former stake, it can proceed with the Challenged Transaction without the approval of Alcon's Independent Directors, and he has openly threatened to eliminate those directors that stand in the way of his plans.   Specifically, in response to questions by UBS analyst Fabian Wenner and Morgan Stanley Analyst Andrew Baum, the following statements were made:

Q:      Fabian Wenner, UBS – Analyst:

But the independent Board of Directors has nothing to say here at all? Okay.

A:      Dan Vasella, Novartis - Chairman & CEO:

*Well, they have to say something as long as they are in the current situation. But once they basically hand over to us and we close the deal then obviously we are in charge there and then it's a different game.*

*       *       *

Q:      Andrew Baum, Morgan Stanley - Analyst

I am just trying to square the circle between the minority events today and your comments on the last quarter when you were clearly equilibrating about whether there was necessary to acquire the minority stake.  At least at that time you knew that the most you would have to pay would be the fair price as assessed by you.  Then why was that internal debate that seemed to be between Daniel and Raymond at the end of the call.  *And then just so I am very clear, you are saying that the three independent directors do not need to vote in favor of supporting the transaction either because that you will have the majority vote or you will be able to eliminate them from the Board when you have the Nestlé stake?*

A:      Dan Vasella, Novartis - Chairman & CEO

Thank you.  So maybe the comment first, there are of course benefits of having minority shareholders, and it wasn't for us a simple equation.  Just to answer that question in principle, forget about what mechanism you would use.  So this decision has been taken very recently and was not something we were clear about ourselves.  So that is a very recent development.  Secondly, we have -- *once we have 77% of the shares, we obviously will also replace the Nestlé board members with Novartis board members representing the 77%, which means it is a majority.  That does not mean that the minority shareholder representatives cannot vote or don't vote.  I am sure they will vote, but basically we have control and you need the simple majority for that decision.  Then on the AGM, obviously, it needs a two-thirds approval by the shareholder.  But having 77%, that is a given on the outcome side.*

84.      Moreover, in a press release published by Novartis on January 4, 2010, Novartis stated that the merger would require only a vote by the full boards of Novartis and Alcon and glaringly failed to mention Alcon's Organizational Regulations, which require approval by the Independent Directors.  The Novartis release states, in part, that:

> The merger will be conditional on the closing of the 52% stake acquisition from Nestlé and would require approval by the Boards of Directors of Novartis and Alcon.  The merger would also require two-thirds approval by the shareholders of Novartis and Alcon voting at their respective meetings . . . .  Under Swiss law, Novartis has the right to vote its Alcon stake in favor of the proposed merger.

85.      Accordingly, in violation of Alcon's own Organizational Regulations and public statements, Novartis has taken the position that the Challenged Transaction requires only the

approval of ***simple majorities*** of the Novartis and Alcon Boards of Directors, together with two-thirds majorities of each company's shareholders.  Indeed, if Novartis's position were accepted, it would mean that Novartis could simply vote its approximately 77% block of shares in favor of the Challenged Transaction and then bless the deal using its eight (out of eleven) captive directors.  As Novartis CFO Breu recently explained, "Yes.  On the Board decision it takes a simple majority of the Board of Alcon to approve the transaction.  Obviously that can be with the current Board or it can be later with the new Board that we can establish once we control 77% of the Company."

86.     If Novartis is correct, then nothing would stop it from offering little or nothing for Alcon's minority shares.  The fact that Novartis is offering something rather than nothing does not salvage its tactics.  This unconscionable result is prohibited by Alcon's Organizational Regulations.

87.     In fact, the Independent Directors of Alcon have stated their firm opposition to the Challenged Transaction as proposed by Novartis.  A press release dated January 4, 2010 stated in pertinent part:

### Alcon Independent Director Committee Responds to Novartis

HUENENBERG, Switzerland, Jan 04, 2010 (BUSINESS WIRE) -- The Alcon, Inc. (NYSE: ACL) Independent Director Committee, in response to comments made today by Novartis AG (NYSE: NVS), stated its belief that Alcon has established certain important protections for the benefit of Alcon's minority shareholders against a coercive takeover bid and is disappointed that Novartis is attempting to circumvent those protections and corporate governance best practices.

Alcon, a majority-controlled entity since it became a public company in 2002, established certain protections in its governing documents for the benefit of its minority shareholders.  ***For example, Article V, Section 5 of Alcon's Organizational Regulations requires approval by a committee of independent directors (as defined under the New York Stock Exchange rules) in connection***

*with a number of transactions, including any proposed merger with a majority shareholder.*

\*   \*   \*

*Novartis appears to be attempting to circumvent the minority protection principles embodied in the actions noted above by claiming that the Alcon minority shareholders are neither accorded minority protections under the Swiss Takeover Code nor the rules under the NYSE.*

*Under any circumstance, Swiss corporate law requires any merger proposal to be approved by a majority of the Alcon Board of Directors with "interested" directors abstaining.* Assuming that the Novartis and Nestlé board representatives along with the Alcon executive board representative abstain, approval by the independent directors comprising the Independent Director Committee would be required to approve a merger with Novartis.

*On its investor conference call this morning, Novartis expressed its view that, if it were unable to obtain the required approval of the Alcon Board of Directors and the Independent Director Committee, Novartis would simply wait until it owned 77% of Alcon to then unilaterally impose the terms of the proposed merger on the minority shareholders.  Such a unilateral action would clearly be inconsistent with the minority protection principles upon which Alcon established itself and Alcon shareholders rely.*

While Novartis has expressed its view that the merger proposal is fair, the Independent Director Committee and its advisors will inform the Alcon shareholders of its formal position once the Committee and its advisors complete their evaluation.

(Emphases added.)

88.     Despite the absence of a fair price or any sort of process to protect the interests of Alcon's minority stockholders, however, the Independent Directors are essentially powerless to prevent Novartis from proceeding with the Challenged Transaction.  Therefore, this Court's intervention is required to prevent substantial and irreparable harm to Alcon's minority stockholders.

89.     Indeed, Novartis has carefully structured this transaction in an attempt to avoid the requirements of Swiss law, the United States securities laws, and the minority protections

provided by NYSE exchange rules.

90.    For example, Novartis claims that the price is fair, and yet Novartis has offered all-stock consideration to the minority stockholders so as to avoid Rule 13e-3 and avoid having to justify the deal's fairness.   Novartis also claims that the Challenged Ttransaction is a "friendly" non-hostile approach, so that the applicable squeeze-out tests under Swiss law do not apply, and yet Alcon's independent directors have said that Novartis's approach is more hostile than "friendly", and Novartis has indicated that it will force the deal through the current, conflicted Board and through the unwilling minority shareholders.

91.    Furthermore, although Alcon's Organizational Regulations provide for minority shareholder protection through the Independent Directors and despite promises repeatedly made to stockholders in Alcon's SEC filings regarding the Independent Directors acting as a bulwark to protect minority shareholder interests from the whims of the controlling stockholder, Novartis claims that those statements and pledges have no effect and can be ignored.

**E.    The Challenged Transaction Consideration Is Undisputed as Inadequate and Unfair**

92.    The Independent Committee, bank analysts and investors are unanimous in their belief that the price offered to Alcon's minority shareholders in the Challenged Transaction is grossly inadequate.  Based on the closing price of Novartis on January 19, 2010, the Challenged Transaction offer price for Alcon's publicly traded shares was valued at roughly $151 – further below the $180 a share in cash that Novartis is paying Nestlé than when the offer was announced.

93.    On January 20, 2010, the Independent Committee sent a letter to Vasella confirming their position on the Challenged Transaction, and expressing the committee's disappointment with Novartis and Nestlé's actions.

94.     The Independent Committee stated, among other things, that "[t]he financial *analysis upon which Novartis's unilateral proposal is based is fundamentally flawed*," and that Novartis' tactics in the Challenged Transaction were "*offensive* and demonstrate a profound disrespect." (Emphases added).

95.     The offer price of the Challenged Transaction is not only inadequate relative to the price being paid to Nestlé, but also as a standalone value.  Defendants purposefully failed to account for Alcon's temporarily-depressed stock price due to the 2008 transaction between Novartis and Nestlé—a direct impetus for the Challenged Transaction.  Likewise, Defendants have failed to secure a fair portion of the extensive merger synergies for the Class that will result once the Challenged Transaction is completed.

96.     As a result of Defendants' conduct, the Company's minority stockholders have been, and will continue to be, denied the fair process and arm's-length negotiation to which they are entitled and which Alcon has promised.  In order to meet their fiduciary duties, the Defendants are obligated to explore transactions that will maximize minority shareholder value and incorporate all aspects of Alcon's substantial value once merged with Novartis.  The consideration offered in the Challenged Transaction does not reflect the true value of the Company, which was known only to Defendants at the time the Challenged Transaction was announced.

97.     As numerous commentators have suggested, it is extremely unusual and unfair to offer two groups of shareholders two different prices for the same stock.  To wit, Professor John Coffee of Columbia University, in response to news of Novartis's offer, has stated:   "A simultaneous offer with this much of a disparity between the majority and minority shareholders is quite rare."

98.     As Swiss bank Vontobel analyst Andrew Weiss succinctly stated: "The question is: Is the offer adequate? And there I think there is still some room for improvement."  Weiss continued, suggesting that the average blended price of $168 per share which Nestlé is receiving for its Alcon shares would be the fair price to pay Alcon minority shareholders, "$168—that caps the discussion as to how much they should be rewarded . . . If the board does not comply then I think Novartis are going to say: 'That's the law.'"  Similarly, JP Morgan analyst Michael Weinstein stated, "[w]e still view the argument that Novartis should pay the public shareholders . . . significantly less than it paid Nestlé as a difficult one to sell."

99.     Additionally, Defendants have failed to consider the tax implications to U.S. minority shareholders.  Typically in a stock for stock-for-stock exchange such as the Challenged Transaction there is no tax liability because the transaction is considered a reorganization rather than a sale under the U.S. Tax Code and is treated as a like-kind exchange for tax purposes. However, tax expert Robert Willens has warned that Alcon's minority shareholders will be subject to tax liability for the shares of Novartis they will receive in exchange for their Alcon shares because "[t]his merger will not constitute reorganization."  For a deal to be considered a reorganization, the target is required to sell at least 40% of the company to show "continuity of interest."  Accordingly Novartis' plan to acquire Alcon minority stockholders' 23% interest in the Company after completion of the Second Stage Acquisition will not satisfy the reorganization requirements under U.S. tax law.

100.    Therefore, Alcon's public stockholders will not even receive the meager premium that Novartis has publicly pledged, and the true value of the consideration they receive will be even less than the purported terms of the Challenged Transaction.

## **CLASS ACTION ALLEGATIONS**

101.     Plaintiffs bring these claims as class claims, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other persons who owned shares of Alcon common stock as of the date hereof and who will have their Alcon shares acquired by Novartis in the squeeze-out at 2.8 shares of Novartis per share of Alcon, and were damaged thereby. Excluded from the Class are Novartis, Nestlé, the Director Defendants, affiliates of the Defendants, and the immediate family members of the Director Defendants.

102.     These claims are properly maintainable as class claims for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of September 30, 2009, Alcon had outstanding 298,983,807 shares of its common stock, held by individuals and institutions too numerous to bring separate actions.  Moreover, it is reasonable to assume that holders of Alcon common stock are geographically dispersed throughout the United States and the world.

(b)     Plaintiffs will fairly and adequately protect the interests of the members of the Class, inasmuch as they are members of the Class and their claims are typical of the claims of all Class members.  Plaintiffs have retained competent counsel experienced in class action litigation.  Plaintiffs' interests are to obtain appropriate relief for themselves and for the Class for the harms arising out of the misconduct set forth herein.

(c)     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include:

(i)     Whether the conduct of Defendants in consummating the Challenged Transaction will constitute a violation of their fiduciary and other

duties owed to Alcon's shareholders;

(ii)     Whether the conduct of Defendants in consummating the Challenged Transaction will constitute a violation of Alcon's Organizational Regulations;

(iii)    Whether the conduct of Defendants in consummating the Challenged Transaction will satisfy the legal requirements of federal common law and New York law;

(iv)    Whether Plaintiffs and the Class will suffer damages as a foreseeable consequence of the Challenged Transaction; and

(v)     Whether Plaintiffs and the Class are entitled to equitable relief, declaratory and/or preliminary or permanently injunctive relief.

(d)     A class action is superior to other available methods for the fair and efficient adjudication of Plaintiffs' claims.  It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action for these claims.   In addition, the bringing of separate actions would put a substantial and unnecessary burden on this and other Courts throughout the United States, while a single class action can determine the rights of all class members with judicial economy.

(e)     Furthermore, as the damages suffered and to be suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs committed against them.  No unusual difficulties are likely to be encountered in the management of the class claims.

(f)     Defendants have acted on grounds generally applicable to the Class with

respect to the matters complained of in the direct claims, thereby making appropriate the relief sought in those claims with respect to the Class as a whole.

(g)     The prosecution of separate actions would create the risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or adjudications which as a practical matter might be dispositive of the interests of other members of the Class.

## CLAIMS FOR RELIEF

### COUNT I

**Against Alcon for Breach of Contract Through Violations of Alcon's Organizational Regulations**

103.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

104.    Alcon's Organization Regulations constitute a valid contract between Alcon and its minority shareholders.

105.    The conduct of Alcon violates Alcon's Organizational Regulations, which provide that transactions such as the Challenged Transaction must be approved by a majority of the independent directors of Alcon's Board of Directors.

106.    By reason of the foregoing, Alcon breached the terms of Alcon's Organizational Regulations, and have caused Plaintiffs and the Class to suffer substantial harm.

107.    The Class will be irreparably harmed if Alcon is allowed to proceed with the Challenged Transaction.

108.    Plaintiffs have no adequate remedy at law.

### COUNT II

**Against the Director Defendants for Aiding and Abetting Alcon's Breach of Contract Through Violations of Alcon's Organizational Regulations**

109.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

110.    Alcon's Organization Regulations constitute a valid contract between Alcon and its minority shareholders.

111.    The conduct of Alcon violates Alcon's Organizational Regulations, which provide that transactions such as the Challenged Transaction must be approved by a majority of the independent directors of Alcon's Board of Directors.

112.    The Director Defendants had actual knowledge of Alcon's breach of its Organizational Regulations and substantially assisted Alcon in such breach.

113.    By reason of the foregoing, these defendants aided and abetted Alcon's breach of the terms of Alcon's Organizational Regulations, and have caused Plaintiffs and the Class to suffer substantial harm.

114.    The Class will be irreparably harmed if these defendants are allowed to proceed with the Challenged Transaction.

115.    Plaintiffs have no adequate remedy at law.

**COUNT III**

**Against Novartis and Nestlé for Tortious Interference with a Contract**

116.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as through fully set forth herein.

117.    Alcon's Organization Regulations constitute a valid contract between Alcon and its minority shareholders.

118.    Novartis and Nestlé both knew that Alcon's Organization Regulations constitute a valid contract between Alcon and its minority shareholders.

119.    Without any justification, Novartis and Nestlé have induced Alcon and are

threatening to induce the Director Defendants to violate Alcon's Organizational Regulations, which provide that transactions such as the Challenged Transaction must be approved by a majority of the independent directors of Alcon's Board of Directors.

120.     By reasons of the foregoing, these defendants have caused Plaintiffs and the Class to suffer substantial harm.

121.     Plaintiffs have no adequate remedy at law.

## COUNT IV

### Against Alcon and Nestlé for Promissory Estoppel

122.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

123.     Since 2003, Alcon has filed Form 20-Fs on an annual basis with the SEC.  Nestlé, as Alcon's majority shareholder, has controlled the contents of Alcon's Forms 20-F.

124.     In these Form 20-Fs, Alcon has made clear and unambiguous promises to its public shareholders that the Board would only approve a transaction with the Company's majority shareholder upon the recommendation of a majority of the Company's independent directors.

125.     Moreover, Alcon's Organizational Regulations have been made publicly available to all Alcon shareholders.

126.     Alcon's minority shareholders reasonably, foreseeably, and detrimentally relied on Alcon's promises that it made in its Form 20-Fs and the corporate governance processes set forth in Alcon's Organizational Regulations, and were thereby induced to purchase Alcon shares on the NYSE.  If Alcon shareholders had been told that Nestlé and/or Novartis could acquire their shares at a self-imposed price while denying Alcon's minority shareholder the specific

protections described in the Forms 20-F and Organizational Regulations, no Alcon shareholder would rationally purchase Alcon shares on the NYSE.

127.    As a result of the Class's reliance on Alcon's promises, Alcon is estopped from allowing Board approval of any transaction by any means other than those prescribed in the Company's Forms 20-F and Organizational Regulations, which promised have been repeatedly and specifically touted by the Company.

128.    In order to avoid unconscionable injury to the Company's minority shareholders, Plaintiffs seek a declaration that the promises contained in the Forms 20-F and the terms of the Organizational Regulations are binding on the Company and the Company is prohibited from amending or repealing the terms of the Organizational Regulations that effect the Challenged Transaction or any other proposed offer.

129.    Plaintiffs have no adequate remedy at law.

**COUNT V**

**Against Novartis, Nestlé, Alcon and the Director Defendants for Declaratory Relief**

130.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as through fully set forth herein.

131.    The Organizational Regulations define the responsibilities and behavior of the Alcon Board.

132.    Pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201, Plaintiffs seek a declaration concerning the rights and legal relations flowing from of Article V, Section 5 and Article VIII, Sections 1, 2 and 3 of the Organizational Regulations.  Plaintiffs seek a declaration that Article V, Section 5 and Article VIII, Sections 1, 2 and 3 apply to the Alcon Board's approval of the Challenged Transaction and, as such, consummation of the Challenged

Transaction is conditioned upon the approval of a majority of the Independent Directors.

133.    The Challenged Transaction constitutes one or both of the following under Article V, Sections 5 (a) and (b): "a proposed merger, takeover, business combination or related party transaction of the Company with the Majority Shareholder;" or "a proposed bid for the shares of the Company by any entity owning a majority of the Company's outstanding voting rights."  As such, pursuant to Articled V, Section 5 of the Company's Organizational Regulations, the Challenged Transaction requires the recommendation of "a majority of the members of the Independent Director Committee" for the Board to resolve to approve the Challenged Transaction.

134.    Additionally, Article VIII Sections 1, 2 and 3 requires "Members of the Board [to] abstain from exercising their voting rights in matters involving a Conflicting Interest," where Conflicting Interest is defined as "any interest a Board member may have with respect to a matter due to the fact such Board member or a Related Person (as hereinafter defined) has a financial or non-financial interest . . . in, or is otherwise closely linked to, the matter, and such interest is of such significance to the Board member or a Related Person that the interest would reasonably be expected to interfere with the Board member's judgment if he were called upon to participate in discussions of the Board or any Board Committee relating to, or vote on, the matter."  Novartis and Nestlé's control over the Director Defendants creates a conflicting interest under Article VIII of the Organizational Regulations, requiring the Director Defendants to abstain from voting in favor of the Challenged Transaction.

135.    The Challenged Transaction, which purports to merely require a majority of the Alcon Board's approval, violates the Organizational Regulations, and Plaintiffs seek a declaration in that regard concerning the rights and other legal relations flowing from the

Organizational Regulations as applied to the Challenged Transaction.

## COUNT VI

### Against Novartis, Nestlé, and the Director Defendants
### for Violation of Fiduciary Duty

136.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

137.    Novartis and Nestlé, acting independently and in unison, are controlling shareholders of Alcon.  In particular, Nestlé holds an absolute majority of Alcon's equity while Novartis exercises economic and practical control of its own significant stake as well as of Nestlé's equity stake.   Accordingly, Novartis and Nestlé owe fiduciary duties to Alcon's minority shareholders.

138.    By virtue of their director positions, the Director Defendants owe fiduciary duties to Alcon and its public shareholders.

139.    Novartis, Nestlé and the Director Defendants are ignoring and violating the rights of Alcon's minority shareholders, who purchase their shares on the NYSE.

140.    By reason of the foregoing, these defendants have caused Plaintiffs and the Class to suffer substantial harm.

141.    The Class will be irreparably harmed if these defendants are allowed to proceed with the Challenged Transaction.

142.    Plaintiffs have no adequate remedy at law.

## COUNT VII

### Against Novartis and Nestlé
### for Aiding and Abetting Breach of Fiduciary Duty

143.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

144.    Novartis and Nestlé have acted and are acting with the knowledge of, or with reckless disregard to, the fact that the Director Defendants are in breach of their fiduciary duties to Alcon's minority stockholders and that the Challenged Transaction will violate Alcon's Organizational Regulations, and accordingly have participated in their breach of fiduciary duties owed to the Class.

145.    Novartis and Nestlé knowingly aided and abetted the Director Defendants' and Alcon's wrongdoing alleged herein by proposing and attempting to force through the Challenged Transaction, which substantially undervalues the equity interests of Alcon's public shareholders. Accordingly, Novartis and Nestlé rendered substantial assistance to the Director Defendants' and Alcon's breaches of fiduciary duty and violation of the Company's Organizational Regulations in order to effectuate the Challenged Transaction at the expense of Alcon's minority shareholders.

146.    As set forth above, Novartis and Nestlé, independently and in coordination with each other, have effective control over Alcon.  To the extent that their combined control comes from their coordinated efforts, Novartis and Nestlé are both aiding and abetting each other's breaches of fiduciary duties to Alcon's minority shareholders.

147.    Plaintiffs and the Class have no adequate remedy at law.

## COUNT VIII

### Against Novartis and Nestlé
### for Unjust Enrichment

148.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein

149.    Defendants Nestlé and Novartis are being enriched at the expense of the Class.

150.    The enrichment is unjust as it stems from an abuse of power, breach of fiduciary

duty, and breach of contract and quasi-contractual obligations.

151.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper class action maintainable under Federal law, and that Jurisdiction and Venue are proper in this Court and Judicial District;

B.    Declaring that the Challenged Transaction violates Alcon's Organizational Regulations and is a breach of contract;

C.    Declaring that Defendants are stopped from completing the Challenged Transaction on the terms proposed by the doctrine of Promissory Estoppel;

D.    Preliminarily and permanently enjoining the Challenged Transaction until such time as the Independent Directors vote to approve it and the consideration to be paid to minority shareholders of Alcon is fair, reasonable, and just in the circumstances;

E.    Preliminarily enjoining Alcon, Novartis and Nestlé from any effort to change the composition or duties of the Independent Committee;

F.    Against all Defendants and in favor of Plaintiffs and the Class for the amount of damages sustained by them as a result of Defendants violations of Alcon's Organizational Regulations;

G.    Awarding to the Class restitution from Defendants;

H.    Directing the Alcon Board, Novartis and Nestlé to take all necessary actions to comply with their respective fiduciary duties under applicable law;

I.      Awarding Plaintiffs and the Class the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  January 21, 2010.                    Respectfully submitted,

                                             BERNSTEIN LITOWITZ BERGER &
                                             GROSSMANN LLP


                                             Gerald H. Silk
                                             Mark Lebovitch
                                             Amy Miller
                                             Brett Middleton
                                             1285 Avenue of the Americas
                                             New York, New York 10019
                                             Telephone: (212) 554-1400
                                             Fax: (212) 554-1444
                                             *Co-Lead Interim Class Counsel*

                                             BARROWAY TOPAZ KESSLER
                                             MELTZER & CHECK, LLP
                                             Marc A. Topaz
                                             Lee D. Rudy
                                             Michael Wagner
                                             J. Daniel Albert
                                             280 King of Prussia Road
                                             Radnor, Pennsylvania  19087
                                             Telephone: (610) 667-7706
                                             Fax: (610) 667-7056

                                             *Co-Lead Interim Class Counsel*

LABATON SUCHAROW LLP
Christopher J. Keller
Sidney S. Liebesman
Ethan D. Wohl
Nicholas R. Hector
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477

*Co-Lead Interim Class Counsel*

GRANT & EISENHOFER P.A.
Jay W. Eisenhofer
James J. Sabella
Natalia Williams
485 Lexington Avenue, 29th Floor
New York, New York 10017
Telephone: (646) 722-8500
Fax: (646) 722-8501

*Co-Lead Interim Class Counsel*

KAHN SWICK & FOTI, LLC
Lewis S. Kahn
Neil Rothstein
Albert M. Myers
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Chair of Plaintiffs' Executive Committee*

**Ex. A**

**Exhibit 99.1**

# ALCON, INC.

## BOARD OF DIRECTORS

### *ORGANIZATIONAL REGULATIONS*

**February** *2009*

# ALCON, INC.
# BOARD OF DIRECTORS
# *ORGANIZATIONAL REGULATIONS*

## *Table of Contents*

ARTICLE I Authority .............................................................................2

ARTICLE II Executive Bodies of the Company .......................................2

ARTICLE III The Board ..........................................................................3

ARTICLE IV Chairman and the Vice-Chairman .....................................7

ARTICLE V Board Committees ..............................................................8

ARTICLE VI Executive Officers of the Company and the Group .........14

ARTICLE VII Chief Executive Officer ..................................................15

ARTICLE VIII Conflict of Interest .........................................................15

ARTICLE IX Interests in Shares and Options ......................................18

ARTICLE X General Provisions ...........................................................19

ARTICLE XI Final Provisions ...............................................................19

## ARTICLE I

Authority

Section 1.  Authority. These Organizational Regulations (the **Regulations**) are enacted by the Board of Directors of Alcon, Inc. (the **Company**) pursuant to art. 716b of the Swiss Code of Obligations (**CO**) and art. 21 para. 1 and 25 of the Company's articles of association (the **Articles of Association**). They govern the powers and duties of the Company's executive bodies and the organization of the Group Executive Management (as hereinafter defined).

Section 2.  Company. The Company is the holding company of an international group of companies active in the ophthalmic and related businesses. As such it performs strategic, financial and management functions not only for the Company itself but also with respect to the companies controlled by it. In view of this Group-wide function, the executive bodies and officers of the Company have to resolve on matters that pertain both to the Company and to other companies of the Group (as hereinafter defined). Notwithstanding this, in any event, the executive bodies of the Company shall give due respect to the legal independence of all Group companies and to the local law applicable to them.

Section 3.  Organization. For the purposes of these Regulations, the **Group** shall mean the Company and its Subsidiaries, where **Subsidiaries** means all such companies and **Subsidiary** shall mean any such company in which the Company holds directly or indirectly a majority of the voting rights or has the right to appoint a majority of the members of the Board of Directors.

References in these Regulations to the masculine gender ("he") shall be deemed also to include the feminine gender ("she").

## ARTICLE II

Executive Bodies of the Company

Section 1.  Executive Bodies and Management. The following are the Executive Bodies of the Company:

(a)  the Board of Directors (the **Board**);

(b)  the chairman of the Board (the **Chairman**);

(c)  the Board Committees established from time to time pursuant to these Regulations (the **Board Committees**);

(d)  the officers of the Company (the **Officers**); and

(e)  the managing director and Chief Executive Officer of the Group (the **CEO**).

Section 2.  Group Executive Management. To the extent these Regulations do not reserve specific powers to the Board, the Officers or the CEO, group executive management (the **Group Executive Management**) shall be coordinated by the senior executive officers of Alcon Laboratories, Inc. (**Alcon Laboratories**).

ARTICLE III

The Board

Section 1.  Organization. The Board elects a Chairman, a Vice-Chairman, and the members of the Board Committees from its members each year following the annual general meeting.

The Board is comprised of three classes of directors (Class I, Class II and Class III) serving staggered terms. The Board shall determine the classes of its members; provided, however, that each class shall include one independent director. The initial terms of each class expired as set forth below, and the successors to each class of directors shall be elected to hold office for a term of three years, so that the term of office for one class of directors shall expire in each year.

(a)  Class I Board members had initial terms of office expiring at the annual general meeting of shareholders in 2003;

(b)  Class II Board members had initial terms of office expiring at the annual general meeting of shareholders in 2004; and

(c)  Class III Board members had initial terms of office expiring at the annual general meeting of shareholders in 2005.

Board members shall retire from office no later than the annual general meeting after their 72nd birthday.

The Board further appoints a Company secretary who need not be a member of the Board.

Section 2.  General Powers. The Board shall exercise its function as required by law, the Articles of Association and these Regulations. The Board shall determine the principles of the Company's and the Group's business strategy and policies.

The Board shall be authorized to pass resolutions on all matters which are not (i) reserved to the shareholders' meeting of the Company (**Shareholders' Meeting**) by the Articles of Association, (ii) delegated to the CEO or the Officers, provided that applicable law allows such delegation, or (iii) the tasks reserved to any Board Committee by applicable law or these Regulations.

Section 3.  The Board has the following powers and duties:

(a) the ultimate direction of the Company and the issuance of the necessary guidelines in accordance with applicable Swiss law and regulations;

(b) the determination of the Company's organizational structure, including the enactment and amendment of these Regulations;

(c) the determination of the Company's accounting principles, financial control and financial planning;

(d) the appointment and removal of the Company secretary, the members of the Board Committees nominated by the Board and the Executive Management of the Company and the Group, as well as the determination of their signatory power and the signatory power of other authorized signatories (see Article X, Section 1);

(e) the ultimate supervision of the persons entrusted with the management of the Company, in particular with regard to their compliance with applicable law, the Articles of Association, these Regulations and any ancillary regulations and guidelines of the Company;

(f) the adoption of resolutions concerning an increase in share capital to the extent that such power is vested pursuant to Swiss corporation law in the Board and of resolutions concerning the confirmation of capital increases and corresponding amendments to the Articles of Association, as well as making the required report on the capital increase;

(g) the review and approval of the business report and the financial statements and any required filings with regulatory authorities or stock exchanges (unless delegated by these Regulations) as well as the preparation of the Shareholders' Meeting and the implementation of its resolutions;

(h) the examination of the professional qualifications of the Company's auditors;

(i) the notification of the court if the liabilities of the Company exceed the assets of the Company (art. 725 CO);

(j) the approval of transactions as listed in Annex 3.3 (k) to these Regulations of the Company and any company of the Group;

(k) the approval of the annual investment and operating budgets as well as the long-term plan of the Company and the Group;

(l) the exercise of shareholder rights in the Subsidiaries, as well as the ultimate control of the business activities of the Subsidiaries;

(m) the approval of executive regulations promulgated in accordance with Article XI, Section 2 of these Regulations;

(n) the establishment of the Company's dividend policy;

(o) the approval of any registration statements, prospectuses, listing particulars, notices and circulars to holders of Company securities or recommendations in respect of any matters which may be submitted to holders of the Company's securities (unless delegated by these Regulations);

(p) the review and approval of the recommendations of the Board Committees;

(q) the response to any approach regarding a takeover offer for the Company;

(r) the adoption, implementation and interpretation of any code of ethics and business practice;

(s) the ratification of documents requiring Board approval according to the Swiss Merger Act;

(t) to determine the membership and terms of reference of any Board Committees; and

(u) to take any and all other decisions or actions that are vested with the Board according to applicable law and that cannot be delegated.


Section 4.  Delegation of Other Duties. The Board herewith delegates all other duties, including the preparation and implementation of the Board resolutions as well as the supervision of particular aspects of the business in the sense of art. 716a para. 2 CO and the management of the Company in the sense of art. 716b CO to the CEO.

The Board may, upon giving appropriate notice to the corporate body or individual to whom it has delegated any of its powers and duties, re-assume responsibility for such powers and duties. Similarly, the Board may, upon giving appropriate notice, delegate such powers and duties to any other corporate bodies or individuals as it may from time to time deem appropriate. Any such delegation shall operate as a variation of the rules of competence set forth in these Regulations unless and until the Board re-assumes responsibility for any delegated matters.

Section 5.  Meetings. The Board shall convene as often as necessary, at least four times a year. Board meetings shall be held at the Company's place of incorporation or at such other place as the Board may determine.

The meetings shall be called by the Chairman or on his behalf by the Secretary. A meeting shall also be called by the Chairman upon the written request of a Board member indicating the items and the proposals to be submitted. The Chairman shall decide whether persons other than the directors may attend a meeting.

Notice of meetings shall be given ten days in advance in writing and the notice shall set forth the agenda. Each member of the Board may demand that items be placed on the agenda. The relevant request must be submitted in writing to the Chairman at least 14 days before the meeting. Urgent items that are brought up after the notice of the meeting has been distributed may be discussed at the meeting. Resolutions on such matters can only be passed if all Board members attending the meeting agree. In urgent cases, the Chairman may call a meeting at short notice in writing or by other convenient means of communication.

Meetings of the Board may be held in person or by telephone conference or other means of direct communication.

Section 6.  Board Resolutions. The Board shall have a quorum when the majority of its members are present. Board members cannot appoint proxies. No attendance quorum is required if the meeting is called to certify an increase of capital and to effect the amendment of the Articles of Association related thereto.

Subject to Article V, Section 5 of these Regulations, resolutions of the Board shall be adopted upon a majority of the votes cast. In case of a tie, the acting chairman has a casting vote.

Resolutions may also be passed in writing, provided no Board member requests oral deliberation within 3 business days of notification of the proposal. To be valid, resolutions in writing must have been communicated to all Board members, and must have been approved in writing by a majority of the Board members.

In urgent cases, the Board may pass circular resolutions by e-mail, provided that all members of the Board have received the proposed resolutions and that none of the members requests that the matter be deliberated at a board meeting. Any such urgent circular resolutions shall be ratified by the Board at a subsequent meeting or by circular resolution in writing.

Section 7.  Board Minutes. All resolutions shall be properly recorded in Board minutes which must be signed by the acting chairman and the Secretary.

In the case of resolutions by circular letter (in writing), such letters qualify as Board minutes if signed by all, including the dissenting, members of the Board and the Secretary.

Section 8.  Information and Reporting. Each member of the Board is entitled, at the Board meetings, to request and receive from the other Board members and from the management information on all affairs of the Company.

Outside of the Board meetings, each member of the Board may request information from the CEO on the general course of business and, upon approval by the Chairman, each member of the Board may obtain information on specific transactions and/or access to business documents.

Section 9.  Compensation. All members of the Board, except for the Chairman and the CEO, shall be paid an annual cash retainer for their services as directors out of the funds of the Company. Such compensation, including any award of nonqualified stock options, restricted stock or restricted stock units to non-employee directors, shall be determined by the Compensation Committee.  A non-employee director is defined as being neither a member of Nestlé's board of directors nor a full-time employee of Nestlé or Alcon.

In addition to the above, the directors shall be paid out of the funds of the Company all expenses properly incurred by them in the discharge of their duties, including their expenses of traveling to and from the meetings of the Board, meetings of the Board Committee, Shareholders' Meetings and separate meetings of the holders of any class of securities of the Company.

The Board may grant special compensation to any director who performs any special or extra services to or at the request of the Company. Special compensation may be made payable to a director who has performed any special or extra services in addition to his ordinary compensation (if any) as a director.

ARTICLE IV

Chairman and the Vice-Chairman

Section 1.  Powers and Duties. The Chairman has the following powers and duties:

(a) organizing and preparing of the agenda for the Shareholders' Meetings and Board meetings;

(b) presiding over the Shareholders' Meetings and Board meetings; and

(c) signing of the Company's application for registration with the Commercial Register (which function may be delegated to other Board members).

Section 2.  Authority. Should the Chairman be unable or unavailable to exercise his functions, his functions shall be assumed by the Vice-Chairman, or if the latter should also be unable or unavailable, another member of the Board appointed by the Board.

ARTICLE V

Board Committees

Section 1.  General. The Board may appoint Board Committees for specific areas from among its members. Together with their appointment, the Board shall establish the appropriate rules with respect to the mission, the authority and the reporting of the pertinent Board Committee.

All members of the Board are invited to attend any meetings of any of the Board Committees and,  upon request of the chairman of such Board Committee, will receive all material distributed to such Board Committee members.

Notwithstanding the generality of the above, the following permanent Board Committees shall be appointed.

Section 2.  Compensation Committee. The Compensation Committee shall be comprised of at least four members of the Board, at least one of which shall be designated by Nestlé as long as Nestlé remains as the Company's majority shareholder (the **Majority Shareholder**), one of which shall be designated by Novartis AG for so long as it is a shareholder of the Company holding at least 10% of the Company's outstanding shares, and at least two of which shall be independent directors (as that term is understood pursuant to the rules and regulations of the New York Stock Exchange as applicable from time to time (the **NYSE Rules**) and to the extent permitted by the NYSE rules).  The Compensation Committee shall operate under and in accordance with a Charter adopted by the Board.

The members of the Compensation Committee shall be appointed for a one-year term. Members of the Compensation Committee shall be eligible for re-election.

The Compensation Committee shall have the following powers and duties:

(a)  review of the general compensation strategy of the Company and the Group;

(b)  recommendations for approval by the Board of compensation and benefits programs for the CEO and the members of Group Executive Management;

(c)  review of the terms of employment between the Company and any executive officer or key employee;

(d) administration of the long-term incentive plan and recommendations to the Board for individual grants under this plan; and

(e) decision on the remuneration of the Board members.

The Compensation Committee shall meet at least twice per year. It shall report to the full Board on any decisions taken and on any other important employment, salary and benefit matters.

The Compensation Committee may recommend to the Board of Directors that a discretionary pool of options or other incentive awards be made available to the CEO for grant to employees of the Group in any given business year. Any option grants by the CEO shall be ratified by the Compensation Committee on a quarterly basis. The size and terms of the discretionary pool of options shall be determined by the Board of Directors upon recommendation of the Compensation Committee on an annual basis. Any unawarded options out of the discretionary pool for a given business year will be available for allotment to employees in subsequent business years.

Section 3.  Audit Committee. The Audit Committee shall be comprised of at least three members of the Board all of whom shall be independent directors as defined under the NYSE Rules. In addition, each member of the Audit Committee shall meet all applicable requirements of the Audit Committee Policy of the New York Stock Exchange with respect to financial literacy, accounting or related financial expertise, and any other matters required by the NYSE. The Audit Committee shall invite one representative of the Majority Shareholder to participate in the deliberations relating to the matters contemplated under this Section 3 paragraphs (h), (i), (j), (k) and (m) below, and on financial matters to be submitted to the Board of Directors for approval.  The Audit Committee shall operate under and in accordance with a committee charter adopted by the Board.

The purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities to oversee the Company's financial reporting process, including monitoring the integrity of the Company's financial statements and the independence and performance of the Company's internal and external auditors. The Audit Committee's responsibility is one of oversight and, in carrying out its responsibility, the Audit Committee is not providing any expert or other special assurance as to the Company's financial statements.

The Chief Financial Officer of the Alcon Group may be invited to attend meetings of the Audit Committee as a guest.

The members of the Audit Committee shall be appointed for a one-year term. Members of the Audit Committee shall be eligible for re-election.

The Audit Committee shall have the following powers and duties:

(a) to review the adequacy of the system of internal accounting procedures of the Company and the Group, and to oversee that effective systems of internal financial controls and for reporting non-financial operating data are maintained;

(b) to make recommendations to the Board regarding the appointment of independent auditors of the Company and the Group;

(c) to hold discussions with the independent auditors of the Company and the Group regarding their audit procedures, including the proposed scope of the audit, the audit results and the related management letters;

(d) to review the audit results and related management letters;

(e) to review the services performed by the independent auditors of the Company and the Group in connection with determining their independence;

(f) to review the reports of the internal and outside auditors and to discuss their contents with the auditors and with the Group Executive Management;

(g) to oversee the selection and terms of reference of the internal auditors and the outside auditors of the Company and the Group;

(h) to make recommendations for approval by the Board of an asset and liability management policy and strategic direction;

(i) to have overall supervisory responsibility to ensure proper implementation of the financial strategy as approved by the Board;

(j) to monitor strategy execution, portfolio management, risk management and the carrying out of special actions necessary to support the strategy;

(k) to review periodically the financial results of the Group as achieved;

(l) to oversee that the financial performance of the Group is properly measured, controlled and reported;

(m) to recommend any share repurchase program for approval by the Board;

(n) to review and discuss the quarterly financial statements with management, and to review and discuss the annual financial statements with management and the outside auditors;

(o) to ensure the ongoing compliance of the Company and the Group with legal require-ments, accounting standards and the provisions of the NYSE Rules;

(p) to approve (i) the form and contents of a press release containing information about the Company's earnings (**Earnings Release**) for each quarter other than the quarter ending December 31, (ii) the issuance of each Earnings Release by the Company in the form approved by the Audit Committee, (iii) the form and contents of a Report of Foreign Issuer on Form 6-K containing financial statements and management's discussion and analysis of financial condition and results of operations (a **Report**) for each quarter other than the quarter ending December 31, (iv) the furnishing of each Report to the United States Securities and Exchange Commission and all exchanges on which the Company's securities are listed to the extent required by the rules of such exchanges, in each case in the form approved by the Audit Committee; and

(q) to review and reassess the adequacy of the Audit Committee provisions of these Organizational Regulations annually and submit any proposals for revision to the Board for approval.

In discharging its oversight responsibilities, the Audit Committee shall have unrestricted access to the Company's management, books and records.

The Audit Committee shall meet at least four times per year. It shall regularly report to the Board on its findings and propose the appropriate actions. The ultimate responsibility for approving the annual and quarterly financial statements will remain with the Board.

Section 4. Nominating and Corporate Governance Committee. The Nominating and Corporate Governance Committee shall be comprised of at least four members of the Board, as determined from time to time by the Board.  At least two Committee members shall be chosen from among the independent Directors as defined under the NYSE Rules; in addition, at least one Committee member shall be designated by Nestlé as long as Nestlé remains as the Majority Shareholder, inclusive of the Vice-Chairman of the Board, and one Committee member shall be designated by Novartis AG for so long as it is a shareholder of the Company holding at least 10% of the Company's outstanding shares. The Nominating and Corporate Governance Committee shall operate under and in accordance with a committee charter adopted by the Board.

The members of the Nominating and Corporate Governance Committee shall be appointed by the full Board for a one year term. Members of the Committee shall be eligible for re-election. The chairperson of the Committee shall be designated by the Board.

The Nominating and Corporate Governance Committee shall have the following powers and duties:

(a) Determination of the criteria, objectives and procedures for selecting members of the Board;

(b) Search and review of potential candidates qualified to become members of the Board, and recommendation of such individuals to the full Board for a nomination for election by the shareholders;

(c) Review of nominations for re-election of Board members;

(d) Recommendation to the Board as to the class of directors on which a new director shall serve;

(e) Recommendation of Board members for appointment to a Board committee;

(f) Review of appropriateness of continued service on the Board of members whose circumstances (including business or professional affiliations or responsibilities) have changed or who contemplate accepting a directorship on another public company board or an appointment to an audit or compensation committee of another public company board;

(g) Recommendation to the Board for the appointment of the members of the Executive Management, upon motion of the CEO;

(h) Oversight of the Company's orientation process for newly elected members of the board, and assistance of the board in its implementation; assessment of the adequacy of and need for additional continuing director education programs;

(i) Development of corporate governance guidelines for the Company, assessment of those guidelines at least on an annual basis;

(j) Oversight of the system and procedures for the education, development and orderly succession of senior members throughout the Group, including, at least annually, review of the CEO's short- and long-term succession plans for the CEO and other senior management positions;

(k) Coordination of the annual evaluation of the Board and its committees;

(l) Review of its own performance and reassessment of the adequacy of its rules of procedures.

In discharging its functions, the Nominating and Corporate Governance Committee shall have the authority to retain and terminate any search firm to be used to identify candidates for the position of Board member or member of Executive Management. The Committee may further obtain, at the expense of the Company, advice and assistance from internal or external legal, accounting or other advisors as it deems advisable without having to seek Board approval. The Committee shall finally have the authority to conduct or authorize investigations into or studies of any matters within the Committee's scope of responsibilities.

The Nominating and Corporate Governance Committee shall meet at least four times per year. It may request that any directors, officers or other employees of the Company, or any other person whose advice is sought by the Committee, attend any Committee meetings to provide such information as the Committee requests. The Committee shall take minutes of its meetings, and shall regularly report to the Board on its findings and propose the appropriate actions.

Except as set forth in this Article V, Section 4 or in any resolution of the Board of Directors, the Nominating and Corporate Governance Committee shall set its own rules of procedure.

Section 5.   Independent Director Committee. If any of the following transactions is proposed to be taken by the Company, the Board shall form a special committee of no less than three independent directors as defined under the NYSE Rules who shall be responsible for protecting the interests of the minority shareholders of the Company. The Board shall only resolve such matters if a majority of the members of Independent Director Committee so recommends. Such matters are

(a) a proposed merger, takeover, business combination or related party transaction of the Company with the Majority Shareholder or any group company of the Majority Shareholder;

(b) a proposed bid for the shares of the Company by any entity owning a majority of the Company's outstanding voting rights;

(c) a proposed repurchase by the Company of all the shares not owned by an entity owning a majority of the outstanding voting rights of the Company; or

(d) any change to the powers and duties of the Independent Director Committee.

Section 6.  Committee Procedures. Each of the Board Committees shall establish its own terms of reference which shall, to the extent necessary or expedient, comply with the provisions of the NYSE Rules.

Board Committees shall meet at the place of incorporation of the Company or at another place as determined by the chairman of the Board Committee.

Section 7.   Research and Development and Scientific Advisory Board. The Board may appoint a research and development and scientific advisory board (the **R&D Advisory Board**) that is comprised of no fewer than five members. The chairman of the R&D Advisory Board shall be designated by the Board, one member shall be designated by the Majority Shareholder, and the remaining members of the R&D Advisory Board shall be designated by the Chairman of the Company and shall not otherwise be affiliated with the Company or the Majority Shareholder.

The members of the R&D Advisory Board shall be appointed for terms of up to three years. Members shall be eligible for re-election.

The R&D Advisory Board shall have no executive or managerial functions. Instead, its function shall be:

(a) to review and make recommendations regarding the Company's research and development objectives; and

(b) to monitor new developments, trends and initiatives in the pharmaceutical industry.

The R&D Advisory Board shall meet at least twice per year. It shall regularly report to the full Board on its procedures.


ARTICLE VI

Executive Officers of the Company and the Group

Section 1.  The Company. The Company is a holding company which operates principally through its operating Subsidiaries. All business and operational decisions (including cost control and similar measures) as well as decisions of business strategy of the Group shall be determined by the Board. In addition, the executive officers of the Company (other than the CEO) are responsible for

(a) conducting the administrative affairs of a holding company, including handling all communications with the competent commercial register and tax authorities and keeping of the Company's statutory books and records;

(b) exercising the shareholder rights with respect to those Subsidiaries that are directly held by the Company;

(c) administration of trademarks owned by the Company; and

(d) funding of research and development projects of the Group on a Group-wide basis, administration of intellectual property rights derived from such research and development projects, collection of license income relating to intellectual property rights derived from such research and development projects; and purchase of intellectual property rights.

Section 2.  The Group. The principal Subsidiary of the Company is Alcon Laboratories. The executive management of Alcon Laboratories will coordinate the activities of the Group, subject to the ultimate direction and control by the Board. In this capacity, the executive management of Alcon Laboratories will

(a) coordinate the ongoing business and operations of the operating Subsidiaries of the Group;

(b) coordinate research and development, manufacturing, sales and distribution activities of the Group;

(c) coordinate marketing activities of the Group; and

(d) coordinate financing, treasury, legal and tax functions (other than matters relating directly to the holding company).


## ARTICLE VII

### Chief Executive Officer

Section 1.  Appointment and Term of Office. The CEO is appointed by the Board for an indeterminate term of office. Notwithstanding anything to the contrary, his term shall automatically end upon termination of his Board membership.

The CEO shall be registered in the commercial register as Managing Director (*Delegierter des Verwaltungsrates*). The CEO shall coordinate the group-wide activities in his function as Chief Executive Officer of Alcon Laboratories.

Section 2.  Powers and Duties. The CEO shall have all the powers and duties that are not explicitly reserved to the Board or a Board Committee by these Regulations.

Section 3.  Reporting. The CEO shall regularly inform the Board at the Board meetings on the current course of business and all major business matters of the Company and its Subsidiaries. Extraordinary matters shall be reported to the members of the Board without delay by circulation letter or any other means of communication.


## ARTICLE VIII

### Conflict of Interest

Section 1.  Definitions. For purposes of Articles VIII and IX:

(a) **Conflicting Interest** shall mean any interest a Board member may have with respect to a matter due to the fact such Board member or a Related Person (as hereinafter defined) has a financial or non-financial interest (including but not limited to an interest with respect to such matter for a Related Person that is detrimental to the Company or

15

at conflict with the interests of the Company (**Competitive Interest**)) in, or is otherwise closely linked to, the matter, and such interest is of such significance to the Board member or a Related Person that the interest would reasonably be expected to interfere with the Board member's judgement if he were called upon to participate in discussions of the Board or any Board Committee relating to, or vote on, the matter.

(b) **Related Person** of a Board member means

(i) the spouse (or a parent or sibling thereof) of the Board member, or a child, grandchild, sibling, parent (or spouse of any thereof) of the Board member, or an individual having the same home as the Board member, or trust or estate of which an individual specified in this clause (i) is a substantial beneficiary;

(ii) a trust, estate, incompetent or minor of which the Board member is a trustee, administrator or guardian; or

(iii) one of the following persons or entities: (A) an entity of which the Board member is a director, general partner, agent, major shareholder, employee or designee of such person or entity to the Board; (B) a person that controls one or more of the entities specified in subclause (A) or an entity that is controlled by, or is under common control with, one or more of the entities specified in subclause (A); or (C) an individual who is a general partner, principal or employer of the Board member.

Section 2.  General. A Board member who believes that he may have a Conflicting Interest (**Conflicting Director**) which involves the Company shall inform the Chairman of the fact and the nature of the Conflicting Interest as soon as he becomes aware of such Conflicting Interest. In the event that the Chairman becomes aware of a Board member's potential Conflicting Interest, the Chairman shall promptly contact the potentially Conflicting Director and discuss with the Conflicting Director the nature and extent of such Conflicting Interest.

Upon receipt of the notice that a Board member has a Conflicting Interest, or upon the Chairman becoming aware of a Conflicting Interest of a Board member, the Chairman will implement the appropriate measures to ensure that the interests of the Company are adequately protected. The Chairman will resolve to what extent the Conflicting Director shall be excluded from information and deliberations relating to the matter giving rise to the Conflicting Interest. At the next meeting of the Board, the Chairman shall inform the Board about the Conflicting Interest and the measures taken in order to adequately protect the Company. To the extent that a Board member disagrees with the conclusion that a Conflicting Interest exists or with the measures taken to address such Conflicting Interest, he may request that the Board consisting of non-Conflicted Directors only shall resolve as to the issue of the existence of a Conflicting Interest and the measures to be taken.

In the event that the Chairman is the Conflicting Director, the Chairman or any Board member who becomes aware of the Conflicting Interest shall inform the Board about the Conflicting Interest and, following a discussion with the Chairman, the members of the Board other than the Chairman shall determine the appropriate measures to take to protect the Company's interests and determine to what extent the Chairman shall be excluded from pertinent information, the deliberations and the voting relating to the matter giving rise to the Conflicting Interest.

Subject to any applicable statutory provisions to the contrary, a Board member shall not be disqualified by his office from entering into any contract with the Company (either with regard to his tenure of any office or position with the Company, or as vendor, purchaser or otherwise).

Section 3.  Duty to Abstain. Members of the Board shall abstain from exercising their voting rights in matters involving a Conflicting Interest; it being understood that they shall abstain from participating in, or receiving any information in respect of, any item or matter brought before the Board or any Board Committee in which they may have a Competitive Interest. If a Board member is required to abstain from voting in a matter, he shall not be counted in the quorum of the meeting in question. In addition, such Board member, as well as the other members of the Board, shall use their respective best efforts to ensure that the Board member with the Conflicting Interest does not receive any non-public, proprietary and/or confidential information with respect to such matter. In particular, and without limitation to the foregoing, a Board member shall not vote or be counted in the quorum of the meeting in respect of any resolution concerning the following matters:

(a) his own appointment, including fixing and varying its terms;

(b) the termination of his own appointment as the holder of any office with the Company or any other company in which the Company holds an equity interest;

(c) any transaction in which he or any Related Person is an interested party.

Notwithstanding the provisions of the foregoing paragraph, a director shall be entitled to vote and be counted in the quorum on:

(a) any issue or offer of securities of the Company in respect of which the director or any Related Party is or may be entitled to participate in their capacity as holder of any such securities;

(b) any contract in which he or any Related Party is interested only by virtue of his interest in securities of the Company;

(c) any contract concerning pension fund or retirement, death or disability benefits schemes under which he may benefit and which affords to directors only those

privileges and advantages which are generally afforded to the employees to whom the fund or scheme relates;

(d) on any proposal regarding the stock incentive plan which relates both to directors and employees and affords to any directors only those privileges and advantages which are generally afforded to the employees to which the scheme relates; and

(e) any contract concerning the purchase or maintenance of insurance for any director or officer of the Company against any liability.


## ARTICLE IX

### Interests in Shares and Options

Section 1.  General.  Each Board member and member of the Group Executive Management shall disclose to the Company the extent of his shareholdings and holdings of options to purchase shares of the Company on a regular basis as established by the Board from time to time.

Section 2.  Specific Rules.  Each Board member and member of the Group Executive Management shall, upon assuming office, notify the Company in writing of

(a) the number of shares (and options or conversion rights with respect to shares) of the Company held by himself or any Related Person;

(b) the number of other securities of the Company held by himself or any Related Person;

(c) the number of shares (and options or conversion rights with respect to shares) of any Subsidiary of the Company held by himself or any Related Person

(the securities referred to in lit. (a) through (c) above collectively, the **Relevant Securities**).

This information shall be updated at least once annually or more frequently if requested by the Board.

Other events which require notification include (i) the acquisition or disposal of any Relevant Securities, (ii) the entering into of a contract to sell any such Relevant Securities, and (iii) the assignment of any right granted to a Board member or to a member of the Group Executive Management to subscribe for Relevant Securities.

Section 3.  Share Dealings. The Board will establish a separate insider trading policy and a policy on dealings in shares of the Company.


# ARTICLE X

## General Provisions

Section 1.  Signatory Power. The Board members and all other persons authorized to represent the Company shall have joint signatory power by two for the Company unless resolved otherwise by resolution of the Board.

Section 2.  Confidentiality. The Board members and officers shall keep confidential all information and documents obtained in connection with the exercise of their function for the Company.

Upon termination of their function, the Board members and officers shall without delay return to the Company all documents obtained in connection therewith.

Section 3. Insurance. The Company may procure Directors and Officers' liability insurance for the Board members and for the key executive officers of the Company and the Group in line with best practice for US listed pharmaceutical companies. Any costs of such insurance shall be charged to the Company.


# ARTICLE XI

## Final Provisions

Section 1.  Effectiveness. These Regulations shall become effective as of the date of approval by the Board.

Section 2.  The corporate bodies and officers entrusted with the management of the Company shall promulgate such executive regulations as are necessary for the implementation of these Regulations subject to prior approval by the Board as mentioned in Article III, Section 3(m) above.

Section 3.  The Board shall review these Regulations from time to time with a view to ascertain whether they are appropriate for their purpose. Such a review shall first be undertaken prior to the annual general meeting approving the financial statements for the business year 2002 and thereafter no less than once annually. Any amendment of these Regulations shall only be valid if such amendment is in writing and is approved by at least two-thirds of the Board members attending such meeting. Any amendment affecting the

powers and duties of the Independent Director Committee shall only be valid if approved by a majority of the members of such committee.

19

Section 4.  Any provisions of these Regulations relating to nomination and/or appointment rights of the Majority Shareholder shall be amended or repealed as and when the equity interest of the Majority Shareholder in the Company shall fall below 50% of the voting rights of the Company and/or the equity interest of Novartis AG falls below 10% of the voting rights of the Company.

SO RESOLVED as of February 10, 2009

The Chairman:                           The Vice-Chairman:

/s/ Cary Rayment                        /s/ Francisco Castañer

# Ex. B

**Exhibit 99.1**



**Alcon Independent Director Committee Determines Novartis' Merger Proposal to Minority Shareholders of Alcon is Grossly Inadequate**

- o *Alcon's Standalone Value Dramatically Exceeds Novartis' Proposal*
- o *Novartis' Financial Analysis of Alcon Shares is Fundamentally Flawed*
- o *Compulsory Nature of Novartis' Proposal Violates Well-Established Principles of Fairness and Equitable Treatment*
- o *Committee to Defend Rights Accorded to Minority Shareholders in Alcon Organizational Regulations and Swiss Law*
- o *Committee to Take All Appropriate and Available Actions to Protect Minority Shareholders and Prevent Unilateral Removal of Independent Directors*
- o *Committee to Host Conference Call for Alcon Shareholders*

**HUENENBERG, Switzerland – January 20, 2010 –** The Independent Director Committee (the "Committee") of Alcon, Inc. (NYSE: ACL) today announced that it formally responded to the January 4 proposal from Novartis AG ("Novartis") to attempt to acquire the minority publicly traded shares of Alcon pursuant to a compulsory merger under Swiss law.  In its letter to Dr. Daniel Vasella, Chairman and CEO of Novartis and an Alcon Board member, the Committee stated that based on, among other things, advice from its independent financial advisor, it had determined that the price and other terms proposed by Novartis are grossly inadequate and that the financial analysis upon which Novartis' unilateral proposal is based is fundamentally flawed.

The Committee also announced that the coercive tactics deployed by Novartis are offensive and demonstrate a profound disrespect for Alcon's minority shareholders, many of whom are employees who, for more than 60 years, created the value in Alcon.  The Novartis proposal would inequitably and unfairly distribute that value to its two largest shareholders, which is neither befitting a company of Novartis' stature nor equitable to the Alcon shareholders, many of whom have been long-term investors since the initial public offering in 2002.  The Committee notes that Alcon employees are one of the largest minority shareholders.

The Committee reached this decision after a careful review of the terms and financial aspects of Novartis' proposal and analysis of information provided by Alcon and its senior management team about the company's past and anticipated financial performance, growth prospects and merger synergy opportunities.  The Committee worked closely with its independent financial and legal advisors, Greenhill & Co., Sullivan & Cromwell LLP and Pestalozzi, Zurich, in undertaking its analysis.

Novartis proposed acquiring Alcon shares at a price of 2.8 shares of Novartis for each share of Alcon through a compulsory merger transaction.  As of January 19, 2010, the proposal is valued at $151.43 per Alcon share due to the decline in Novartis' stock price, significantly below the $180 in cash that will be paid by Novartis to acquire its majority position.

Thomas G. Plaskett, Chairman of the Committee, said, "The Committee strongly believes that the underlying historical record and Management's expected future financial performance of Alcon justify a significantly higher price than that reflected in the current proposal by Novartis.  Moreover, minority shareholders have rights accorded to them that must be respected."

Plaskett added, "We understand and are concerned that the current situation is disconcerting to the highly valuable employee asset base at Alcon, many of whom are shareholders, and we appreciate their continuing hard work and dedication as we work through these issues at the Board level."

The Committee believes that the financial methodology used by Novartis intentionally ignored Alcon's documented market and operational performance, including Alcon's history of trading at a premium valuation compared to its peers.  The market has consistently recognized and awarded Alcon a premium for its attractive fundamentals, industry leadership and outperformance of quarterly earnings expectations 26 out of 29 times since its 2002 IPO.

The Committee also recognizes that the price offered to public shareholders is substantially lower than that which will be paid to Nestlé for the controlling stake, which is virtually unprecedented in the recent history of similar transactions.

The Committee also reiterates its disappointment with Novartis' public implication that Novartis can essentially force Alcon's minority shareholders to accept the terms of its proposal. In fact, the Committee believes that Swiss law and Alcon's Organizational Regulations specifically protect minority rights by requiring that a committee of independent directors approve a proposed merger with a majority shareholder.  The Committee believes those rights were reaffirmed and strengthened by Alcon's full board of directors as recently as December 2008 when, following Novartis' initial purchase from Nestlé of an approximately 25 percent stake in Alcon, the Alcon Board of Directors approved the formation of a standing committee of independent directors whose stated purpose is to protect the minority shareholders.  Dr. Vasella, the Novartis representative on the Alcon Board, was a board member at the time and approved the formation of the Committee.

Plaskett continued, "Advocates of sound corporate governance and well-established principles of fairness and equity in both Switzerland and the U.S. are rightly offended by Novartis' coercive attempts to take advantage of the Alcon minority shareholders.  The Committee will evaluate and take all appropriate and available steps to ensure that the rights of Alcon's minority shareholders are not trampled on in the manner proposed by Novartis."

The Committee also believes that Swiss law and Alcon's organizational documents require directors to recuse themselves from decisions on which they are conflicted, which means that the non-independent Novartis-appointed directors would be required to abstain from any Alcon Board decision as to whether or not to approve Novartis' merger proposal. Likewise, conflicted directors would also be required to abstain from voting with respect to the replacement of any Committee members and any other action taken with the purpose of circumventing the authority of the truly independent Committee members to accept or reject the merger proposal.

The Committee has posted additional information including answers to frequently asked questions, a summary of its financial analysis, and links to the Swiss Code of Obligations, the Swiss Merger Act and the Alcon Organizational Regulations on their Web site: www.transactioninfo.com/alcon.

**Investor Conference Call / Webcast**

The Committee will host a conference call and webcast for Alcon investors on Wednesday, January 20 at 8:30 am Eastern Time.  The conference call can be accessed at +1 866 831 6272 (domestic) and +1 617 213 8859 (international).  The participant passcode is 63612961.

The webcast can be accessed on the investor relations section of Alcon's Web site www.alcon.com.

A replay of the conference call will also be available for one week.  The replay dial-in number is +1 888 286 8010 (domestic) and +1 617 801 6888 (international).  The replay passcode is 52559963.

**Media Inquiries:**
Steve Lipin/Jennifer Lowney
Brunswick Group (212) 333-3810


The following letter has been sent to Dr. Vasella:

Novartis AG
Lichtstrasse 35
4056 Basel
Switzerland


Attention: Dr.  Daniel Vasella, Chairman and CEO


January 20, 2010


Dr.  Vasella,

I am writing to you on behalf of the Independent Director Committee (the "Committee") of the Alcon, Inc.  ("Alcon") Board of Directors in response to the January 4th proposal by Novartis AG ("Novartis") to attempt to squeeze-out Alcon's minority shareholders in a compulsory merger in which each Alcon share would be exchanged for 2.8 shares of Novartis stock (the "Novartis Merger Proposal"), which is currently valued at approximately US$151.43 per Alcon share in Novartis shares (as compared to the US$180 in cash that Novartis has agreed to pay Nestlé AG ("Nestlé")).

**Response to Novartis Merger Proposal**

After careful consideration with its independent financial and legal advisors, the Committee has determined that the Novartis Merger Proposal is grossly inadequate, that the analysis underlying the Novartis Merger Proposal is fundamentally flawed and that the Novartis Merger Proposal is not in the best interests of Alcon and its minority shareholders.  For these reasons, as more fully explained below and in the attached "Summary of Financial Analysis" exhibit, the Committee rejects the Novartis Merger Proposal.

- **The Committee believes, based on the advice of its independent financial advisor, Greenhill & Co., that the fundamental value of Alcon on a standalone basis significantly exceeds the price that Novartis has offered.**

- **The Committee believes that Alcon's "unaffected share price" is significantly greater than the US$137 share price asserted by Novartis and that the analysis that Novartis employs to support such assertion is fundamentally flawed.**

  o As described in the attached Summary of Financial Analysis, Novartis' "Methodology 1" applies price-to-earnings ratios across inconsistent time periods.  Correcting this misleading approach would produce a range of implied unaffected share prices that approximates the US$164.35 closing price of Alcon as of December 31, 2009.

  o Novartis' "Methodology 2"  asserts that Alcon should trade in line with a number of broad healthcare stock indices, ignoring the fact that, since its IPO in 2002, Alcon has consistently outperformed every one of the 12 indices that Novartis cited (both through April 4, 2008 and since).

- o Novartis' "Methodology 3" selectively chooses comments from the equity analyst community in an attempt to demonstrate support for Novartis' viewpoint, highlighting three analysts (of 12 who cover Alcon) who refer to an unaffected share price that approximates US$137.  While not all analysts covering Alcon comment on unaffected share price, seven of the eight analysts (including the three cited by Novartis) who express a view of the expected Novartis squeeze-out price cite prices of US$181 or greater.

- **Based on input from Alcon's management, the Committee believes that Novartis has understated achievable synergies in the transaction, by failing to quantify the significant revenue synergies that exist.  Additionally, Novartis has overstated its ability to realize cost synergies absent a full combination and Novartis does not accord the minority shareholders <u>any</u> synergy value.**

- **The Committee disagrees with Novartis' assertion that a 12% premium to the unaffected share price is "very much in line with what minority shareholders in similar transactions have received."**

  - o A review of the approximately 250 squeeze-out transactions (of US$100 million in size or greater) that were announced over the past decade shows that the final premium paid for the minority shares over the share price one week and one month prior to announcement were 27% and 30% on average, respectively, with median values of 18% and 21%, respectively.

  - o Indeed, Novartis itself set a precedent in 2005 when it paid a premium of approximately 25% to the unaffected share price to squeeze-out the minority shareholders of Eon Labs, which also represented a premium of 9% to the price paid for the majority stake.

- **In addition to undervaluing Alcon's minority shares, the Committee notes the compulsory nature of Novartis' proposal.**

- **Due to the uncertainties in value inherent in using equity (as opposed to cash) as transaction currency, the Committee views Novartis' proposal to exchange its shares for Alcon shares as inferior to the terms offered to Nestlé.**

In summary, the Committee, after careful consideration with its independent financial advisor, has concluded that Novartis has dramatically understated Alcon's "unaffected share price" and that the premium that should be applied to such share price is significantly higher than the 12% proposed by Novartis.

## Role of, and Effect on, the Alcon Employees

Alcon's employees are its greatest asset and it is only through their hard work and unparalleled talent that Alcon became the successful company that you praised when Novartis first acquired its stake in Alcon in April 2008 and again when Novartis exercised its call option to acquire Nestlé's remaining stake in Alcon at a price of US$180 in cash per Alcon share.  These employees are extremely loyal to, and are highly invested in, Alcon, collectively owning millions of Alcon shares through various types of employee stock ownership plans, making the Alcon employees one of the largest minority shareholders.  These employees can observe that

Novartis' proposal inequitably and unfairly distributes the value created by such employees over time to Alcon's two largest shareholders, at the expense of all minority shareholders.

## Role of the Independent Director Committee

As a member of the Alcon Board of Directors that approved our Committee's formation and charter in December 2008, you are well aware that the Committee's stated purpose is to act as a disinterested body with respect to related party transactions involving major shareholders of Alcon (such as Novartis) and to protect the interests of Alcon and the minority shareholders of Alcon in this type of transaction.

Our review and analysis over the past few weeks confirms the view expressed in the Committee's January 4th press release that the Novartis Merger Proposal amounts to an attempt to circumvent the minority shareholder protections accorded by Swiss law and embodied in Alcon's Organizational Regulations.  After further review with our legal advisors, the Committee has reached the determination that Novartis cannot unilaterally impose the terms of the Novartis Merger Proposal on the minority shareholders without the approval of a disinterested body of directors.  By operation of Article VIII of the Organizational Regulations and relevant provisions of Swiss law, including Article 717 of the Code of Obligations, any conflicted directors, which would include the non-independent directors appointed by Novartis, would be required to abstain from voting with respect to matters relating to the Novartis Merger Proposal.  This fundamental protection was implemented to protect minority shareholders against potential coercive actions that could be taken by controlling shareholders, and the Committee is disappointed that Novartis appears to be attempting to flout such protections so brazenly.

You and the Novartis management team appear to have publicly implied that Novartis will simply replace the members of the Committee once Novartis consummates its purchase of Nestlé's remaining Alcon shares if we do not agree with Novartis' assessment of the fairness of the Novartis Merger Proposal to the minority shareholders.  Obviously, we do not believe that this strategy works, and note that any attempted actions to effect it (such as replacing the members of the Committee, changing the Committee's composition or otherwise stripping protections for the minority shareholders in the Organizational Regulations) would result in the same conflict of interest noted above in respect of the Novartis Merger Proposal and, as such, the conflicted directors would be required to abstain from voting with respect to such actions.

It is important that you understand that the Committee's response today is only the first of potentially many steps that the Committee may take in the fulfillment of its obligations to defend Alcon and the minority shareholders pursuant to Alcon's organizational documents and Swiss law.

In response to the feedback and questions that we have received from myriad shareholders, the Committee has prepared responses to Frequently Asked Questions, which detail the legal hurdles that Novartis faces in any attempt to unilaterally impose the terms of the Novartis Merger Proposal on the minority shareholders, even after the point at which this becomes a "different game," to use your words.

## Conclusion

As I am sure you will appreciate, the Committee has committed to make its views with respect to the Novartis Merger Proposal known to all of the minority shareholders, and is therefore including this letter in the materials that it is making publicly available today.  We believe that it is in everyone's interests to resolve this matter in an expeditious and equitable manner.

Sincerely,


Thomas G.  Plaskett

## Summary of Financial Analysis

- **The Committee believes, based on the advice of its independent financial advisor, Greenhill & Co., that the fundamental value of Alcon on a standalone basis significantly exceeds the price that Novartis has offered.**
  - A discounted cash flow analysis of management's strategic plan supports a meaningfully higher standalone value (i.e., before considering synergies or squeeze-out premium).
  - The Committee has great confidence in Alcon management's ability to execute its strategic plan.
  - Alcon is viewed as a unique investment opportunity by the market and has consistently been rewarded with a premium valuation to its peers since its 2002 IPO.
    - Alcon is the clear market leader in nearly all of its businesses (surgical, pharmaceutical, and consumer) and has developed the largest global sales and marketing infrastructure in ophthalmology.
    - Alcon is the only public company of scale that focuses almost exclusively on ophthalmology.
    - The eye care sector enjoys strong growth opportunities in emerging markets due to the attractive cost/benefit of cataract surgery and rising incomes, and is less susceptible to reimbursement pressure in the US due to its geographic and channel diversity.
    - Alcon has exceeded analyst estimates 26 of 29 quarters since its IPO.
  - Alcon's shares closed at US$164.35 on the trading day prior to Novartis' announcement.
  - As of January 19, 2010, Novartis' offer represents a discount of 16% to the US$180 per share that Novartis is paying Nestlé for control.

- **The Committee believes that Alcon's "unaffected share price" is significantly greater than Novartis contends.**
  - Alcon's share price rose steadily throughout 2009; while Novartis asserts that this was driven by speculation in Alcon's shares, it coincided with positive earnings surprises in every quarter and progressively increasing future earnings expectations among analysts (see attached annex).
  - Alcon has seen no appreciable spikes in trading volume, which might indicate speculation, other than on a single date in December when an equity analyst wrote a report about a potential squeeze-out.
    - The report was preceded by comments from Novartis CFO Raymund Breu on October 22, 2009 indicating no plans to execute a squeeze-out of the minority shareholders.

- **The Committee believes that the analysis that Novartis employs to support its assertion that Alcon's unaffected share price is US$137 is fundamentally flawed.**
  - Novartis' "Methodology 1" asserts that Alcon should trade at a similar or lower price-to-earnings ratio than it did in April 2008 (prior to the announcement of the Nestlé/Novartis transaction).
    - However, Novartis calculates the 2010E price-to-earnings ratio as of April 2008 (i.e. a 3-year forward multiple) and applies that same multiple to 2010E expected earnings today (i.e., a 1-year forward earnings estimate),

ignoring the fact that nearly two years have passed since April 2008, and that 3-year forward multiples are typically lower than 1-year forward multiples for high-growth companies.

▪ For instance, in the Novartis example, Alcon traded at the following forward multiples of earnings as of April 2008 (note that each successive year results in a 2x – 3x multiple decline due to higher earnings expectations year-over-year)[1]:

    o 2008E (1-year forward multiple) – 22.7x
    o 2009E (2-year forward multiple ) – 19.8x
    o 2010E (3-year forward multiple ) – 17.7x
    o 2011E (4-year forward multiple ) – 15.8x

▪ Novartis should have applied multiples across comparable time periods (e.g., the one-year forward 2008 multiple in April 2008 should now be applied to Alcon's (one-year forward) 2010 earnings estimate).

▪ Correcting Novartis' analysis in this fashion produces a range of unaffected stock prices that approximates the US$164.35 closing price of Alcon on December 31, 2009.

▪ Nor do we agree (for reasons enumerated under the first bullet point above) that Alcon should have experienced the same multiple contraction as other healthcare companies have experienced since April 2008.

o Novartis' "Methodology 2" asserts that Alcon should trade in line with a number of broad healthcare stock indices, ignoring the fact that since its IPO in 2002, Alcon has consistently outperformed every one of the 12 indices that Novartis cited.

**Indexed Share Price Performance of Alcon versus Healthcare Indices[2]**
**March 22, 2002 – April 4, 2008**



---

[1] Multiples based on Alcon's 3-month VWAP of US$143.18 as of April 4, 2008.
[2] Includes only the indices referenced in the Novartis analysis entitled "Summary Assessment of Alcon's Unaffected Share Price" that have existed since Alcon's initial public offering.

- Since the time of Alcon's IPO (or the inception of the index, if more recent) to April 4, 2008, Alcon outperformed the indices by over 20 percentage points on a compound annual basis, on average.
- The market has consistently rewarded Alcon with a premium valuation because of the reasons discussed under the first bullet point above.

o Novartis' "Methodology 3" selectively chooses comments from the equity analyst community in an attempt to demonstrate support for Novartis' view, highlighting three analysts (of 12 who cover Alcon) who discussed an unaffected share price that approximates US$137, while ignoring these same analysts' views of the appropriate price to be paid for the minority shares.

| Analysts Cited by Novartis | Reference to Takeout Price | Synergy Estimate |
|---|---|---|
| BMO Capital Markets | ▪ "at least $181" | ▪ $300 - $400mm |
| UBS | ▪ "up to $236" | ▪ $686mm |
| JP Morgan | ▪ $181 price target | ▪ NA |

- Moreover, 7 of the 8 analysts (including the three cited by Novartis) who express a view on the expected Novartis squeeze-out price cite prices of US$181 or greater.

- **Based on input from Alcon's management, the Committee believes that Novartis has understated achievable synergies in the transaction, by failing to quantify the significant revenue synergies that exist.  Additionally, Novartis has overstated its ability to realize cost synergies absent a full combination and Novartis does not accord the minority shareholders <u>any</u> synergy value.**
  o In addition to the US$300 million of cost synergies cited by Novartis, the Committee believes that there is an even greater amount of revenue synergies, none of which appear to be reflected in the Novartis proposal.
  o The Committee does not believe that Novartis can achieve two-thirds of the potential synergies without total ownership of Alcon:
    - Co-promotion or other agreements would require arms-length negotiations and approval of the Committee; and
    - Novartis could not fully rationalize sales forces or back office functions.

- **The Committee disagrees with Novartis' assertion that a 12% premium to the unaffected share price is "very much in line with what minority shareholders in similar transactions have received."**
  o A review of 247 squeeze-out transactions announced over the past decade with a value greater than US$100 million showed that the final premium paid for the minority shares over the share price one week and one month prior to announcement were 27% and 30% on average, respectively, with median values of 18% and 21%, respectively.
  o Indeed, Novartis itself set a precedent in 2005 when they paid a premium of approximately 25% to the unaffected price to squeeze-out the minority

shareholders of Eon Labs, which also represented a premium of 9% to the price they paid for their majority stake.

- **In addition to undervaluing Alcon's minority shares, the Committee views the terms of the Novartis proposal as inferior to the terms offered to Alcon's current majority shareholder.**
  - Minority shareholders are to receive stock consideration, whereas Nestlé is to receive cash.
  - Stock consideration is offered at a fixed exchange ratio, which creates uncertainty as to the value to be ultimately received by the minority shareholders.
  - In spite of the stock-based consideration, the Novartis merger proposal is likely to be taxable for United States income tax purposes.

## Annex: Unaffected Share Price Analysis

## Fundamental Drivers of Alcon's Share Price Performance

- **Evidence does not support the contention that a large speculative premium was imbedded in Alcon stock prior to the announcement of the Novartis proposal**

- **Alcon shares have steadily risen in 2009 in conjunction with strong earnings announcements and several strategic transaction announcements**

- **Additionally, a high correlation between Alcon's share price change and changes in street earnings would imply that research analyst earnings revisions (along with Alcon's results) appear to have driven the share price performance, in both directions, since early 2008**



Note: Last day of data as of 12/31/2009.
(1) 2010E EPS estimates are per FactSet and indexed as of 1/1/08
Source: FactSet, IBES estimates

**About Alcon**
Alcon, Inc. is the world's leading eye care company, with sales of approximately $6.3 billion in 2008.  Alcon, which has been dedicated to the ophthalmic industry for 65 years, researches, develops, manufactures and markets pharmaceuticals, surgical equipment and devices, contacts lens solutions and other vision care products that treat diseases, disorders and other conditions of the eye.  Alcon operates in 75 countries and sells products in 180 markets.  For more information on Alcon, Inc., visit the Company's web site at www.alcon.com.

# # #

*Caution Concerning Forward-Looking Statements. This press release may contain forward-looking statements within the meaning of the United States Private Securities Litigation Reform Act of 1995. Any forward-looking statements reflect the views of the Committee as of the date of this press release with respect to future events and are based on assumptions and subject to risks and uncertainties. Given these uncertainties, you should not place undue reliance on these forward-looking statements. There can be no guarantee that Novartis or Alcon will achieve any particular future financial results or future growth rates or that Novartis or Alcon will be able to realize any potential synergies, strategic benefits or opportunities as a result of the consummation of the Novartis purchase or the proposed merger.  Also, there can be no guarantee that the Committee will obtain any particular result. Except to the extent required under the federal securities laws and the rules and regulations promulgated by the Securities and Exchange Commission, we undertake no obligation to publicly update or revise any of these forward-looking statements, whether to reflect new information or future events or circumstances or otherwise.*